## STATE OF CONNECTICUT *v.* DOUGLAS W. BUSTER (14545)

PETERS, C. J., CALLAHAN, BORDEN, BERDON and KATZ, Js.

Argued December 1, 1992—decision released February 9, 1993

*Michael A. Fitzpatrick,* special public defender, for the appellant (defendant).

*Richard F. Jacobson,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *John Smriga,* assistant state's attorney, for the appellee (state).

KATZ, J. The defendant, Douglas W. Buster, appeals from the judgment of the Appellate Court affirming the trial court's ruling allowing the introduction into evidence of certain portions of a witness' out-of-court written statement. After a jury trial, the defendant was convicted of manslaughter in the first degree in violation of General Statutes § 53a-55a (a) and carrying a pistol without a permit in violation of General Statutes §§ 29-35 (a) and 29-37 (b). On appeal to the Appellate Court, the defendant claimed that, contrary to *State* v. *Whelan,* 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), the trial court had improperly admitted into evidence certain statements of a nonparty witness contained in the written statement of another witness. The Appellate Court, however, concluded that the statements had been properly admitted by the trial court as a prior inconsistent statement under the three-pronged *Whe-*

*lan* test, and affirmed the judgment. *State* v. *Buster,* 27 Conn. App. 263, 273, 606 A.2d 9 (1992).

We granted the defendant's petition for certification limited to the following two issues:[1] (1) "Was the Appellate Court correct in holding that the trial court properly admitted into evidence certain remarks attributed to a nonparty witness contained in the written statement of another witness, pursuant to *State* v. *Whelan,* [supra]?" and (2) "If the ruling was erroneous, was it harmful?" *State* v. *Buster,* 222 Conn. 909–10, 608 A.2d 692 (1992). We conclude that the trial court improperly admitted the remarks, but that their admission was harmless. Accordingly, the judgment of the Appellate Court is affirmed.

The relevant facts were stated by the Appellate Court in its opinion. "The victim, Robert J. Cioppa, Jr., and a friend, Gary Lester, drove into the parking lot of a Bridgeport housing project at about 12:30 a.m. on March 4, 1989, seeking to buy crack cocaine. Cioppa and Lester had bought drugs there twice earlier in the evening of March 3, 1989. Upon driving into the lot, Cioppa was approached by a drug dealer named Sean, who had sold him narcotics earlier that night. The defendant then approached Cioppa's car window in an attempt to sell him drugs. When Cioppa indicated that he wanted to buy drugs from Sean instead, the defendant drew a gun.

"Behind Sean and the defendant was Ronell Hanks, with whom Cioppa had attended high school. Cioppa

---

[1] Before the Appellate Court, the defendant also argued that the trial court had abused its discretion by denying the defendant the opportunity to present certain surrebuttal evidence and improperly denied motions for judgment of acquittal because there was insufficient evidence to support the convictions. *State* v. *Buster,* 27 Conn. App. 263, 265, 606 A.2d 9 (1992).

These issues are not within the certified questions and, therefore, will not be reviewed by this court.

asked Hanks to intervene in order to prevent the defendant from doing anything with the gun. When the defendant threatened to shoot Hanks, Cioppa attempted to drive away. The defendant, however, fired at Cioppa, fatally wounding him. From the car's front passenger seat, Lester backed the vehicle into the street and steered it along the road until he could get behind the steering wheel and drive to Griffin Hospital in Derby, where Cioppa was pronounced dead.

"At trial, the state presented evidence from several witnesses that it was the defendant who fatally shot Cioppa. Lester testified that although he did not see the defendant's face, the assailant was large and heavyset. Lester testified that one shot was fired from a weapon with a large barrel between seven and eight inches long. Ala Carter, a resident of the housing project, testified that she saw a car enter the parking lot and heard its driver ask for drugs. She testified that the driver was not seeking out the defendant, who ran to the car, and that just prior to the shooting, she heard the defendant tell Hanks to 'mind [his] business.' Carter testified that the defendant shot the driver with a small gun after being rebuffed in his attempt to sell him drugs. She testified that she did not see anyone else there with a gun other than the defendant. Later, the defendant elicited testimony showing that Carter was not in the parking lot at the time of the shooting.

"Jared Fleming also testified that he saw Cioppa's car enter the lot and heard the discussion between the defendant and Cioppa. He testified that both the defendant and Hanks had guns, and that he heard a gunshot but did not see who shot Cioppa. At this point, pursuant to *State* v. *Whelan*, supra, the court admitted into evidence, as a prior inconsistent statement, a written statement Fleming had given to the police subsequent to the shooting. In the statement, which mirrored Carter's testimony, Fleming said he heard the

defendant threaten to kill Cioppa and then watched as the defendant shot him. He did not tell the police, however, that Hanks had a gun.

"Tremayne Newsome testified that he saw a car enter the lot and that a conversation that he could not hear ensued between Hanks, the driver and the defendant, who had a gun. Newsome testified that after going into his house, he heard a gunshot outside. At this point, pursuant to *State* v. *Whelan,* supra, the court admitted into evidence, as a prior inconsistent statement, a written statement Newsome had given to the police. The content of Newsome's statement mirrored Carter's testimony and the statement Fleming had given to the police. In his statement, Newsome said he was outside his house when he saw the defendant and Cioppa arguing about drugs. He said that after he went inside his house, he opened the door, looked out and saw the defendant draw a gun and shoot Cioppa. Hanks also testified that it was the defendant who shot Cioppa. Hanks testified that he had walked away from the defendant and Cioppa's car after the defendant pointed a gun at him and said he would shoot him.

"In his case-in-chief, the defendant presented evidence to show that it was Hanks who shot Cioppa. Beverly Bass testified that she witnessed the incident from a window in the nearby apartment of a friend she was visiting that night. Bass testified that she saw a car drive into the lot and heard an argument about drugs and money. She testified that she heard shots and saw Hanks fire a gun. At the time of the shooting, Bass testified, the defendant was standing near a garbage dumpster, three to four feet from Cioppa's car. She testified that after the shooting, the defendant ran from the scene with a woman named Clara Cummings. Bass did not see a gun in the defendant's hand. [She added that following the incident Hanks fired several additional shots from behind a building. Bass testified

that she did not share any of this information with the police because of threats Hanks had made to her. Bass also disputed Carter's presence in the parking lot at the time of the shooting.]

"Cummings testified that she and the defendant were near the dumpster at about 11:30 p.m., when she saw Hanks, armed with a gun, approach a car that entered the lot. Cummings testified that she heard a shot while she was hiding behind the dumpster and that afterward she and the defendant fled. She testified that the defendant did not have a gun and that he was within her view when Cioppa was shot.

"Another witness, Jermaine Kenney, testified that he was nearby on Trumbull Street talking with a young lady when he saw the defendant running from the parking lot while Hanks was firing a gun. Finally, the defendant elicited testimony from Kenneth Jones that three days after the defendant's arrest, he and Hanks drove to a wooded area off Alba Avenue, where Hanks retrieved a long barreled gun he then sold to Jones for $50. Jones' mother, Rita Holmes, then testified that she found a gun in her home and disposed of it in the household garbage." *State* v. *Buster*, supra, 27 Conn. App. 265–68.

The defendant also called Hanks to the stand. Hanks admitted that he had been present in the parking lot when a car had pulled in. He approached and conversed with the driver. He denied having had any argument and disclaimed any responsibility for the homicide. Hanks gave two separate statements to the police implicating the defendant. On cross-examination, he explained that prior to the shooting, Cioppa had asked him to "get my friend," in response to which the defendant had grabbed Hanks, pointed the gun at him and said "Ronell ain't got nothing to do with this, I'll shoot him too." Hanks testified that as he had walked

away, he heard a shot, heard the car pull away striking a van, and heard the defendant continue shooting.

To rebut the defendant's claim that Hanks was the assailant, the state called Anthony Michael Brown. Brown testified that during the early morning hours of March 4, 1989, he had been at home when he heard gunshots, but that he had not seen the shooting. Brown could not recall much about a meeting with the police at his home on the Sunday after the shooting, nor could he recall what he had told the police in his written statement. After refreshing his recollection by reviewing his statement, Brown remembered having told the police that he had seen a long grayish colored .38 revolver in a bag at his home on the Sunday after the shooting. He also recalled having told the police that a conversation regarding the gun had taken place in the presence of the defendant, the defendant's cousin, Kenneth "Dimpy" Buster (Dimpy), and his own cousin, Jehu. Brown repudiated the statement, however, claiming he had given it while under the influence of narcotics and in response to police threats. He claimed that he had never seen a gun and that the three named individuals had not been to his home on that Sunday.[2]

At this point, the state sought to introduce Brown's written statement pursuant to *State* v. *Whelan,* supra. The pertinent portions of the statement are as follow:

"Q. Did you see a gun?

"A. Yes, I think it was on Sunday.

"Q. What did the gun you saw look like?

"A. It was a long grayish color .38, it was in a bag.

---

[2] On redirect examination, when asked how he came up with the fabricated story, Brown initially asserted that he had never told the detective that there had been a conversation between anyone. Moments later, he conceded that he may have told the detective about a conversation, although he did not recall doing so.

"Q. Who was it that showed you the gun?

"A. Dimpy, [the defendant's] cousin, had it.

"Q. Is the gun now or was it ever in your house?

"A. It [is] not in my house, the only time it was in my house was when Dimpy showed it to me, and he said he was going to bury it at Samuel Johnson School.

"Q. Why was Dimpy going to bury the gun?

"A. Because he didn't want [the police] to get it, it was the gun used to shoot the guy.

"Q. Who was there when you saw the gun, beside you and Dimpy?

"A. My cousin Jehu and [the defendant].

"Q. Have you heard anything further about the gun since you saw it?

"A. Well, while Dimpy was at my house with it, after he had said he was going to bury it, he changed his mind and said he was going to put it in Ronell Hanks' car.

"Q. Why was Dimpy going to put the gun in Ronell's car?

"A. I guess so you all, could find it in there, so Ronell could be in  .  .  .  trouble.

"Q. So then [the defendant] and your cousin Jehu were there when Dimpy had the gun and said how he was going to hide it.

"A. Yes."

Outside the presence of the jury, the defendant objected to the introduction of the remarks attributable to Dimpy and claimed that they constituted hearsay. In response, the state argued that the remarks attributable to Dimpy were not hearsay, but rather were admissible to show their effect on the defendant

and to explain his subsequent conduct. The defendant, upon his arrest, had given a written statement to the police that implicated Hanks in the shooting and reported that the gun Hanks had used might be located in Hanks' car.[3] According to the state, Dimpy's alleged remarks had given meaning to the defendant's otherwise innocuous statement regarding the location of the gun.

Following a brief recess, the trial court ruled that the remarks attributable to Dimpy were admissible to establish "the state of mind of the defendant, and to explain [the defendant's] subsequent statement" to the police. The trial court also ruled that the probative value of the evidence outweighed any prejudice to the defendant. As to the balance of Brown's written statement, the court held that it was admissible for its truth. The defendant's exceptions to the court's ruling were duly noted.

When the jury returned, the trial court reiterated its ruling and explained that the statements attributable to Dimpy were being offered to indicate the state of mind of the defendant and to explain the defendant's subsequent conduct.[4] At the conclusion of the evidence

---

[3] The state subsequently introduced the defendant's written statement as a full exhibit. Significantly, the defendant remarked that "Ronell has the gun that shot the man. It may be in his car, a 1977 Oldsmobile, black with a board in the back that is used as the bumper. The car is unregistered. If the gun is not in his car, it's in his house."

[4] The court stated: "There are some statements which are attributed to a third party in this; and as to those statements, the state is not claiming for the truth of the matter asserted as they are with objective statements. What he saw for instance is in the statement as you indic—as you heard this before so I'm not surprising you. It's an indication that he saw a gun. That comes in for the truth of the matter asserted; at least as far as the [state is] concerned. The rest is up to you.

"But the statements attributed to the gentleman known as Dimpy for instance come in, and are offered by the state strictly to indicate a state of mind of the defendant who was sitting there at the time; and to explain as the state indicates, conduct, which we will get to."

the court explicitly charged the jury regarding the permissible use of Brown's written statement.[5]

In this court, the defendant claims that the trial court improperly admitted the remarks in Brown's written statement in which Brown stated his belief, opinion or surmise (1) that Dimpy had been planning to bury the gun so that the police would not get it and (2) that

[5] The court stated: "Now ladies and gentlemen, despite the general rule on prior inconsistent statements, there are three statements that the Court has treated differently under Connecticut law. There was a claim that Jared Fleming and Tremayne Newsome gave written statements to the police; and that they contained statements somewhat inconsistent with their testimony in court. These statements came into evidence as state exhibits; Exhibit I and Exhibit J to be used substantively for the truth of the matter asserted in them.

"The state claims that these statements cast doubt on some of the witnesses' present testimony in court. You will also recall this is testimony in court as to these inconsistencies. You heard counsel refer to the statements as *Whelan* statements.

"With regard to these earlier written statements to the police made by Jared Fleming and Tremayne Newsome, the Court is satisfied that the jury should have the right to consider the truth of the fact contained in those statements. Therefore, I charge you that you have the right to believe Jared Fleming, Tremayne Newsome's present testimony in court; or you may believe the prior written signed statement. Or, you may believe neither. Remember, you are the sole judges in what evidence is to be believed.

"What I have just said is also true of the statement of Anthony Michael Brown which was introduced by the state on rebuttal which is State's Exhibit K. The state claims it cast doubt on the witness' present testimony in court with which it is inconsistent.

"You will recall the witness' testimony in court as to the contents of the statement. With the exception of statements contained in Exhibit K, which are attributable to the defendant's cousin. I believe the name was Dimpy. The Court is satisfied that it may consider the truth of the facts contained in the statement. Therefore, you may believe Mr. Brown's present testimony in court; or you may believe the prior written signed statement. Or, you may believe neither if you choose.

"The statements of the defendant's cousin, Dimpy, since they are hearsay have been offered by the state not to prove whether or not they're true or false; but only to establish they were made in the presence of the defendant in order to show the state of mind of the defendant; and to explain his subsequent actions. And you have heard argument from the state in that regard."

Dimpy had later decided to place it in Hanks' car to get Hanks in trouble. Specifically, the defendant argues that the trial court should not have admitted Brown's responses to the questions, "Why was Dimpy going to bury the gun?" and "Why was Dimpy going to put the gun in Ronell's car?" The defendant claims that the answers to these two questions violate the personal knowledge prong of *State* v. *Whelan,* supra, and, therefore, are inadmissible.

The admission of prior inconsistent statements in writing for substantive purposes is governed by *State* v. *Whelan,* supra, 753. See also *State* v. *Grant,* 221 Conn. 93, 99, 602 A.2d 581 (1992). In *Whelan,* we held that such a statement is admissible for substantive purposes if the declarant: (1) signs the statement;[6] (2) has personal knowledge of the facts stated; and (3) testifies at trial and is subject to cross-examination. *State* v. *Whelan,* supra; *State* v. *Grant,* supra.

"The rationale for that rule is that its requirements—that the declarant testify and be subject to cross-examination, that he have personal knowledge of the facts stated, and that the statement be in writing and signed by him—justified 'an exception to the hearsay rule . . . to allow the trial court to admit for substantive purposes prior inconsistent statements given under prescribed circumstances reasonably assuring reliability.' " *State* v. *Montanez,* 219 Conn. 16, 26, 592 A.2d 149 (1991), quoting *State* v. *Whelan,* supra, 752. "[The] court has previously adopted exceptions to the hearsay rule where the statements are made under conditions deemed to render them equal in reliability and trustworthiness to those made under the sanction of an oath and the test of cross-examination. *Cherniske*

---

[6] Although Brown could not recall giving the statement, he never contested that the signature on the statement was his and thus the first prong of the *Whelan* test was not contested.

v. *Jajer,* 171 Conn. 372, 376–77, 370 A.2d 981 (1976); *General Motors Acceptance Corporation* v. *Capitol Garage, Inc.,* 154 Conn 593, 597, 227 A.2d 548 (1967). *State* v. *McClendon,* 199 Conn. 5, 10, 505 A.2d 685 (1986)." (Internal quotation marks omitted.) *State* v. *Whelan,* supra. "Substantive admissibility of prior oral statements [however] present[ed] a hazard of error in reporting and increase[ed] the temptation and opportunity for fabrication and distortion by witnesses called to report them," and were for that reason excluded from the rule. Id., 752–53. We noted that "[s]uch oral statements, especially when other persuasive circumstantial evidence of guilt exists, would be inordinately difficult for the declarant to explain and might be critical in convincing the trier of the defendant's guilt." Id., 753.

Of significance to this court in our departure from the common law rule prohibiting the substantive use of prior inconsistent statements was the fact that "the oath is not as strong a guaranty of trustworthiness as it once may have been"; id., 749; and the fact that "when the declarant is in court, under oath, and subject to cross-examination before the factfinder concerning both his out-of-court and in-court statements, 'the usual dangers of hearsay are largely nonexistent. . . .'" Id., 750–51, quoting *California* v. *Green,* 399 U.S. 149, 155, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970). This is true because, " '[i]f, from all that the jury see[s] of the witness, they conclude that what he says now is not the truth, but what he said before, they are none the less deciding from what they see and hear of that person and in court.' " *State* v. *Whelan,* supra, 750, quoting *DiCarlo* v. *United States,* 6 F.2d 364, 368 (2d Cir.), cert. denied, 268 U.S. 706, 45 S. Ct. 640, 69 L. Ed. 1168 (1925). "The jury can, therefore, determine whether to believe the present testimony, the prior statement, or neither. Moreover, prior statements are,

necessarily, made closer to the event in question, when memories are fresher and when there is less likelihood that the statement is the product of corruption, false suggestion, intimidation or appeals to sympathy." *State v. Whelan,* supra.

By asserting that the statements attributable to Dimpy were only Brown's opinions or assumptions, the defendant essentially mounts a challenge to the trial court's ruling based on the second prong of *Whelan.* The Appellate Court appears to have concluded that the objectionable statements complied with the *Whelan* rule, were admissible to show state of mind, or, in any event, constituted harmless error. *State v. Buster,* supra, 27 Conn. App. 273. In applying the principles of *State v. Grant,* supra, the Appellate Court concluded that, "even if the statements at issue were Brown's and not [Dimpy's], Brown need not have had personal knowledge of their underlying facts. Brown need not have witnessed the shooting of Cioppa, and he need not have had personal knowledge that [Dimpy] intended to implicate Hanks by putting the gun in his car. Further, because Brown signed the statement he gave to the police and was cross-examined at trial, his statement was properly admitted as a prior inconsistent statement under the three-pronged *Whelan* test. . . . Finally, the remarks at issue were not offered for the truth of what they assert, but to show the state of mind of the defendant at the time and to explain his subsequent conduct. As such, they were not hearsay and were properly admitted. The court clearly instructed the jury as to the purposes for which the remarks were admitted not once, but twice. Under these circumstances, we find no manifest injustice affecting the fairness or integrity of the defendant's trial." (Citations omitted.) *State v. Buster,* supra, 27 Conn. App. 273.

In *State v. Grant,* supra, we considered the admissibility of the out-of-court, tape-recorded statements of

two witnesses that implicated the defendant in a fatal shooting. We held that the "personal knowledge" prong of the *Whelan* rule does not require that the declarant have witnessed the commission of the crime that is the subject of the prior inconsistent written or recorded statement. Id., 99. We concluded that the circumstances therein reasonably assured the reliability of the statements. Id., 100;[7] see also *State* v. *Estrada*, 26 Conn. App. 641, 657–58, 603 A.2d 1179, cert. denied, 221 Conn. 923, 608 A.2d 688 (1992), in which the Appellate Court reiterated that "the declarant must have personal knowledge of the facts contained within the statement sought to be introduced," though the declarant need not have witnessed the commission of the crime. The court observed that the declarant's "presence or absence at the scene of the crime is merely one factor that may be considered in determining whether the declarant has . . . personal knowledge" of the facts contained within the statement. Id., 658.

In reviewing the remarks contained in Brown's written statement, we conclude that Brown was not repeating assertions made by Dimpy, but rather was expressing his own assumptions. For instance, Detective David Silva asked, "Why was Dimpy going to bury

---

[7] Specifically, in *State* v. *Grant*, 221 Conn. 93, 602 A.2d 581 (1992), the witness, Billie, had personal knowledge that the victim worked for a rival drug dealer and operated out of a house that was across the street from a location where the defendants also sold drugs. Billie was aware of a feud among the dealers and, in fact, had been told by the defendant "that he was unhappy about 'green-eyed Dave's boys' selling drugs in the . . . area and that 'he was gonna take somebody out.' " Id., 101. "Billie [also] observed the defendant carrying a loaded gun the day before the shooting." Id., 101–102. When Billie arrived at the scene after the shooting, he observed the defendant standing on the corner smiling. Id., 102.

The witness, Rice, arrived at the scene following the shooting and discovered that the victim, Albright, had been shot. Shortly thereafter, Rice saw the defendant, who was his cousin, at an apartment not far from the scene of the shooting. The defendant was holding a handgun with an empty clip and told Rice that he had shot and killed Albright. Id.

the gun?'' Brown responded, ''Because he didn't want [the police] to get it, it was the gun used to shoot the guy.'' Later, Silva asked, ''Why was Dimpy going to put the gun in Ronell's car?'' Brown responded, ''I guess so you all, could find it in there, so Ronell could be in . . . trouble.'' These remarks cannot be attributed to Dimpy. The most that can be said of these remarks is that they are Brown's opinions.

This court in *State* v. *Whelan,* supra, 752, created an exception to the hearsay rule ''to admit for substantive purposes a prior inconsistent statement given under prescribed circumstances reasonably assuring reliability.'' As even the defendant acknowledged, this exception allowed the introduction of certain responses in Brown's statements, for example: ''[The gun is] not in my house, the only time it was in my house was when Dimpy showed it to me, and he said he was going to bury it at Samuel Johnson School''; and, ''Well, while Dimpy was at my house with it, after he had said he was going to bury it, he changed his mind and said he was going to put it in Ronell Hanks' car.''[8] The rule of *State* v. *Whelan,* supra, sanctions only those portions of an out-of-court statement to which the witness could testify while on the stand. The two answers contained within Brown's statement to which the defendant objected constitute improper opinion testimony by a witness who lacked personal knowledge of the facts asserted. He would not have been permitted

---

[8] Had Brown stated that Dimpy said he had done something with the gun, Brown would have met the ''personal knowledge'' prong of *Whelan* and the state could have introduced it to show what Dimpy said. The actual content of Dimpy's statement, however, could not have come in for substantive purposes unless another hearsay exception applied. Hearsay within hearsay, or double hearsay, can be introduced for the truth of the matter only if it falls within another exception. See *State* v. *Palozie,* 165 Conn. 288, 295, 334 A.2d 468 (1973); *Brown* v. *Butler,* 71 Conn. 576, 581–82, 42 A. 654 (1899); see generally C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) §§ 11.14.5, 11.8.6.

to offer the opinions in person in front of the jury because he would not have been competent to give such testimony. *Johnson* v. *Newell,* 160 Conn. 269, 277, 278 A.2d 776 (1971). The fact that these assertions were expressed in a written statement does not serve to enhance their admissibility. Therefore, the trial court should not have allowed their introduction into evidence.

The defendant does not claim that the trial court's improper ruling deprived him of any constitutional right. "Because his claim is evidentiary and not constitutional, the defendant bears the burden of establishing that the trial court's erroneous ruling was harmful to him in that it probably affected the outcome of the trial." (Internal quotation marks omitted.) *State* v. *Paulino,* 223 Conn. 461, 478, 613 A.2d 720 (1992). Specifically, "the defendant must demonstrate that it is more probable than not that the erroneous action of the court affected the result." (Internal quotation marks omitted.) *State* v. *Tatum,* 219 Conn. 721, 738, 595 A.2d 322 (1991). The defendant has not satisfied this burden.

Even if Brown's statements concerning Dimpy not wanting the police to find the gun, and his placing of it in Hanks' car to get him into trouble had been redacted from the exhibit, there would still remain that portion of Brown's statement that established that a conversation had occurred in the defendant's presence during which Dimpy stated that he was going to bury the gun on the grounds of a school, but later changed his mind and decided to put it in Hanks' car. On the basis of this evidence alone, the jury would have been free to draw the reasonable, logical and common sense inference that the defendant and Dimpy envisioned a plan by which blame could be attributed to Hanks. The improperly admitted portions of Brown's statement are his own interpretation of Dimpy's remarks and they

suggest nothing more. Once the portion concerning the burial of the gun and the placing of it in Hanks' vehicle was before the jury, it was free to draw this same conclusion.

The defendant's statement given at the time of his arrest was also offered as part of the state's rebuttal in order to corroborate the state's theory that the defendant had been part of a plot to blame Hanks for the killing. In that statement, the defendant told Detective Leo Krusinski that the gun was either in Hanks' car or in his home. The combination of the properly admitted sections of Brown's statement that revealed the defendant's presence at Brown's home when plans were made to frame Hanks and the defendant's own written statement that he also believed that Hanks had the gun, strongly suggest that the defense was a fabrication. Certainly the jury could draw the inference that the defendant was part of a plan to dispose of the gun in an effort to conceal his own involvement with the crime. Brown's inadmissible speculation contributed nothing more than the obvious.

Finally, the defendant presented his defense that Hanks was the assailant through several other independent witnesses. Bass and Kenney testified that Hanks had had a gun and that they had seen him fire it into Cioppa's automobile. Cummings and Linda King testified that the defendant had been unarmed at the time of the shooting. Jones testified that he had seen Hanks retrieve from a wooded area a gun that Jones later purchased from him. Had the jury wanted to believe that Hanks, and not the defendant, was the assailant, it had ample evidence upon which to make that finding based upon the testimony of witnesses who were not at Brown's home the night plans were made to frame Hanks. The state's rebuttal evidence impeached only the defendant and no evidence was offered by the state in rebuttal to challenge any of these

other defense witnesses. Therefore, even if the jury might have been skeptical of the defense based upon the improperly admitted portions of Brown's statement, there remained other defense evidence upon which it could rely. That evidence, moreover, was introduced through witnesses who had not been at Brown's home and who thus had not been implicated in Dimpy's apparent plan to frame Hanks. We cannot say, and there has been no serious suggestion made, that the jury rejected all the other defense witnesses solely as a result of Brown's improperly admitted speculation which, in effect, told the jury nothing more than what it was already free to infer. The improper ruling, therefore, could not reasonably have affected the verdict. *State* v. *Sierra*, 213 Conn. 422, 437, 568 A.2d 448 (1990). Under these circumstances, the defendant has failed to establish the harmfulness of the trial court's ruling.

The judgment is affirmed.

In this opinion the other justices concurred.