STATE OF CONNECTICUT *v.* JAMES FLEMING, JR.
(11816)

LANDAU, HENNESSY and FREEDMAN, Js.

Argued October 24, 1994—decision released January 10, 1995

*Shannon O. Louden,* special public defender, with whom, on the brief, were *Linda L. Morkan* and *Barbara J. Jacobs,* special public defenders, for the appellant (defendant).

*John A. East III,* deputy assistant state's attorney, with whom, on the brief, was *Michael Dearington,* state's attorney, for the appellee (state).

FREEDMAN, J. The defendant appeals from a judgment of conviction, following a jury trial, of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (2)[1] and 53a-48.[2] The

---

[1] General Statutes § 53a-134 (a) provides in pertinent part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime . . . or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon . . . ."

[2] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

defendant claims that the trial court improperly (1) admitted the prior statement of a witness for substantive purposes, (2) admitted evidence that was more prejudicial than probative, and (3) gave a "missing witness" instruction under the *Secondino* rule. The defendant additionally argues that there was insufficient evidence to establish the essential elements of conspiracy. Finally, the defendant urges us to repudiate the *Secondino* rule as applied to criminal cases. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On February 17, 1991, at approximately 1:10 a.m., the victim, Christian Prince, was found lying on the sidewalk in front of St. Mary's Church on Hillhouse Avenue in New Haven. He was transported to Yale-New Haven Hospital at 1:43 a.m., where it was discovered that he was suffering from a gunshot wound to the chest. Despite attempts to resuscitate the victim, he was pronounced dead at approximately 2:06 a.m. An autopsy revealed that a single, small caliber bullet had been fired into the victim's chest, causing his death.

On February 27, 1991, Randy Fleming[3] and Andre Edwards, two of the state's witnesses, were arrested on unrelated drug charges. Subsequently, both Fleming and Edwards gave statements to the police implicating the defendant in the shooting of the victim. The defendant was later charged, by substitute information, with felony murder in violation of General Statutes § 53a-54c, murder in violation of General Statutes § 53a-54a, attempted robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), and conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (2). The defendant was found guilty of conspiracy to commit

---

[3] Randy Fleming is unrelated to the defendant. We refer in this opinion to James Fleming, Jr., as the defendant and to Randy Fleming as Fleming.

robbery in the first degree and not guilty of murder; a mistrial was rendered on the felony murder and attempted robbery charges, as the jury was unable to reach a verdict on those counts.

Additional facts will be discussed where relevant to a specific claim made by the defendant.

I

The defendant first argues that the trial court improperly admitted Fleming's statement into evidence for substantive purposes. The following additional facts are necessary for a proper resolution of this issue.

At trial, the state called Fleming as a witness. Fleming testified that he saw the defendant at around 11:30 p.m. on the night of February 16, 1991, at the Oasis Lounge. Fleming testified that the defendant was at the Oasis Lounge for "at least half an hour, forty-five minutes." He stated that he saw the defendant leave the Oasis Lounge with an individual named Money Russ at around midnight. According to Fleming's testimony, after the defendant left the bar, he remained outside in front of his house for a while, and then went inside his house at around 12:15 a.m., because he had a 12:30 a.m. curfew.[4] Fleming testified that he next saw the defendant the following day.

The state then marked for identification a thirty-one page statement given by Fleming on May 10, 1991, to Detectives Vincent Raucci and Mel Cartocetti of the New Haven police department. Fleming conceded that the facts to which he testified at trial were entirely different from the facts given in the statement to the police but he repeatedly stated that he was forced to make the prior statement to the police. The statement

---

[4] Fleming acknowledged, however, that he did not see the defendant actually go inside his house and that the last time he saw him, the defendant was standing outside in front of his house.

and the tape recording from which it was transcribed were then admitted as full exhibits pursuant to *State v. Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

The statement given to the police contains the following version of the incident in question. Fleming and the defendant, along with Robert Newton and Robert Jones, were riding around on the night of the shooting in a white Nissan Sentra automobile. The defendant was driving. The defendant told Fleming that he wanted to stick up a "cracker," i.e., a white person. The defendant showed Fleming that he had an automatic weapon. When they approached the victim, the defendant put on a ski mask that covered his face, crossed the street to confront the victim, and demanded money. The victim gave the defendant his wallet without a struggle. The defendant pistol-whipped the victim and fired five shots. Fleming saw the victim fall sideways after being shot. The defendant then got back into the car and stated that he had dropped the wallet.

According to Fleming's statement, after the shooting, they drove to 575 Winchester Avenue. Jones went home and the defendant, Fleming and Newton went inside. Fleming and Newton told Andrew Fairweather and Andre Edwards what had occurred. The next day, the defendant and Fairweather agreed that Fairweather would destroy the gun. Fairweather, however, eventually gave the gun back to the defendant, who put it in a bookbag on a shelf in the house. The day after the shooting, after the defendant learned that the victim had died, Fleming saw the defendant stuffing a pipe down the barrel of the gun so that the police would be unable to trace it.

The defendant argues that (1) the prior statement was unreliable because three months had elapsed between the incident and the interrogation, (2) the

statement was not given under circumstances that indicate reliability, (3) the witness was responding to leading questions, and (4) there was no other evidence corroborating the statement. The defendant also argues that the admission of the statement was harmful error.

"Prior inconsistent statements of nonparty witnesses are hearsay and, generally, inadmissible to prove the truth of the matters they assert." *In re Bassel C.*, 33 Conn. App. 90, 94, 633 A.2d 733 (1993). In *State v. Whelan*, supra, 200 Conn. 753, our Supreme Court adopted an exception to the hearsay rule allowing the substantive use of a prior inconsistent statement of a nonparty witness under certain prescribed circumstances reasonably assuring reliability. *State* v. *Woodson*, 227 Conn. 1, 20, 629 A.2d 386 (1993). Such a statement is admissible substantively "if the declarant: (1) signed the statement . . . (2) had personal knowledge of the facts set forth in [his] statement; and (3) testifies at trial and is subject to cross-examination." *State* v. *Borrelli*, 227 Conn. 153, 158–59, 629 A.2d 1105 (1993); see also *State* v. *Williams*, 231 Conn. 235, 249, 645 A.2d 999 (1994); *In re Bassel C.*, supra, 94. This exception applies to tape-recorded as well as written statements. *State* v. *Woodson*, supra, 21.

"[A] prior inconsistent statement ha[s] to be given under circumstances ensuring its reliability and trustworthiness in order to be admissible." *State* v. *Grant*, 221 Conn. 93, 100, 602 A.2d 581 (1992) The admission for substantive purposes of a prior inconsistent statement is limited " 'to situations where the likelihood of fabrication is slight and the risk of coercion, influence or deception is greatly reduced.' " Id., quoting *State* v. *Whelan*, supra, 200 Conn. 753. "It is the trial court's responsibility to weigh the reliability of each statement on a case-by-case basis." (Internal quotation marks omitted.) *State* v. *Borrelli*, supra, 227 Conn. 161.

The defendant first argues that Fleming's statement was unreliable because three months had elapsed between the incident and the interrogation. "Whether a statement is made within a short time after the crime occurred has . . . been considered in determining reliability." *State* v. *Wager*, 32 Conn. App. 417, 428, 629 A.2d 1146, cert. denied, 228 Conn. 912, 635 A.2d 1231 (1993); *State* v. *Buster*, 224 Conn. 546, 557–58, 620 A.2d 110 (1993); *State* v. *Grant*, supra, 221 Conn. 100–101; *State* v. *Alvarez*, 216 Conn. 301, 314, 579 A.2d 515 (1990); *State* v. *Whelan*, supra, 200 Conn. 750. This is because "prior statements are, necessarily, made closer to the event in question, when memories are fresher and when there is less likelihood that the statement is the product of corruption, false suggestion, intimidation or appeals to sympathy." *State* v. *Whelan*, supra, 750.

In *State* v. *Wager*, supra, 32 Conn. App. 428, we noted that there is no requirement that a statement be signed at any particular time. Similarly, there is no specific time when a statement becomes unreliable due to the length of time between the commission of the crime and the making of the statement. Rather, the court considers whether the statement was made "long before the witness' memory might have faded." *State* v. *Whelan*, supra, 200 Conn. 754; *State* v. *Borrelli*, supra, 227 Conn. 160; *State* v. *Alvarez*, supra, 216 Conn. 314. There is nothing in the record to indicate that Fleming's memory had faded at the time he gave the statement to the police. We therefore conclude that the statement was not unreliable simply because it was made three months after the crime occurred.

The defendant next argues that Fleming's prior statement did not meet the "criteria for ensuring reliability" established by *State* v. *Grant*, supra, 221 Conn. 93, and *State* v. *Borrelli*, supra, 227 Conn. 153, and therefore should not have been introduced for substantive purposes. We note, however, that neither *Grant*

nor *Borrelli* established "criteria" that need to be satisfied before an inconsistent statement may be admitted for substantive purposes. In both cases, our Supreme Court noted that certain facts supported the trial court's finding of reliability.[5] In the present case, there are likewise sufficient indicia of reliability in the circumstances surrounding Fleming's statement to uphold its admission for substantive purposes.

As a threshold matter, the prior statement satisfies the criteria established by *Whelan* to admit the statement for substantive purposes. Fleming signed the statement and initialed each of its thirty-one pages. He further swore to its truth and accuracy.[6] Fleming indicated in the statement that he was present at the time of the murder; therefore, it was based on personal knowledge. Fleming also testified and was subject to cross-examination at trial. "Therefore . . . the jury

[5] In *State* v. *Grant,* supra, 221 Conn. 100–101, the court noted that "the statements were contemporaneous tape recordings of the entire interview with each witness. The interviews were conducted only a few days after the shooting. The testimony of the police officers to whom the statements were given indicated that they did not initiate either inquiry regarding [the crime]. Moreover, making false statements to the police could have subjected [the witnesses] to criminal prosecution. General Statutes §§ 53a-157 and 53a-180 . . . . Finally, both witnesses were subject to cross-examination . . . ." (Citation omitted.)

In *State* v. *Borrelli,* supra, 227 Conn. 160, the victim of a crime reported the incident to the police and later recanted her statement. The court noted that "the victim gave her statement to a police officer on the day of the incident described in the statement. . . . She also signed the statement after reading it, and swore to its accuracy under oath. She confirmed at trial that the words in the statement were the words that she had spoken to [the police officer]." Id. The court further noted that the victim's statement was not made in response to leading questions and there was ample corroborative evidence that supported the information contained in the prior statement. Id., 160–61.

[6] "While it is not necessary for a written, signed statement to be sworn in order for it to be admitted under the *Whelan* doctrine; *State* v. *Almeda,* 211 Conn. 441, 452, 560 A.2d 389 (1989); it certainly is a circumstance that adds to the reliability of the statement." *State* v. *Borrelli,* supra, 227 Conn. 160 n.6.

had the opportunity to observe [the witness'] demeanor and assess his credibility at trial. . . . The jury in this case could determine whether to believe [the witness'] prior . . . statement, his trial testimony, or neither.'' (Citations omitted.) *State* v. *Wager*, supra, 32 Conn. App. 429.

As in *State* v. *Grant*, supra, 221 Conn. 100–101, there was a contemporaneous tape recording of the interview with the witness. Fleming could have been subjected to criminal prosecution for making false statements to the police. General Statutes §§ 53a-157 and 53a-180. See *State* v. *Grant*, supra, 101. Fleming confirmed at trial that the words in the statement were the words he had spoken to Cartocetti and Raucci. See *State* v. *Borrelli*, supra, 227 Conn. 160. We therefore find that the statement was given under circumstances that indicate reliability.

The defendant also argues that the statement should not have been admitted because the witness was responding to leading questions. The record reveals that although some leading questions were asked, Fleming was asked numerous questions intended to elicit narrative responses, including a request to describe what happened on the night of the shooting.[7] On the

---

[7] For example, the statement contains the following exchange:

"Q. Okay and when [the defendant] got out of the car did he have to cross the street to get to the student?

"A. Yes.

"Q. Okay when he got up to the student, could you see what he was doing?

"A. I heard him yelling.

"Q. Okay you could hear it?

"A. Yeah.

"Q. What did he say?

"A. 'Get me your wallet. Give me your money.'

"Q. Did you hear what the student said?

"A. 'Here, take the money.' He said 'Here take the money.' Then he said, 'I should shoot you. Should shoot this cracker man. I should shoot this cracker.'

"Q. Okay from where you were, could you see the student hand him the wallet?

basis of the record before us, we cannot conclude that the statement was unreliable because it was made in response to leading questions.

Finally, the defendant argues that the statement was unreliable because there was no other evidence corroborating the statement. We conclude, however, that the statement was supported by corroborating evidence. Cartocetti testified at trial that at one point, the officers and Fleming went out and the officers bought Fleming lunch. While out with the officers, Fleming took them to the location where he personally observed the shooting of the victim and pointed out the location where the victim's wallet was found. Edwards testified at trial that, on the night in question, he overheard the defendant asking Fairweather for guns "to do some stickups" and that he saw Fairweather give guns to the defendant.

On the basis of the foregoing, we conclude that the trial court properly admitted Fleming's prior statement as substantive evidence.[8]

## II

The defendant next argues that the trial court should not have admitted certain evidence that he claims was more prejudicial than probative. Specifically, the defendant argues that because he was charged with conspiracy to commit first degree robbery, the state was required to prove that he had the specific intent

---

"A. He went like this. Yes he went like this. He handed him the wallet. And then [the defendant] said, 'I should shoot this cracker,' and then he just started—I just heard him fire shots. Then I seen [the defendant] running back to the car and then he said, 'I dropped the wallet, I dropped the wallet.' "

[8] In light of this conclusion, it is unnecessary for us to consider the defendant's claim that the trial court's improper admission of that evidence was harmful.

to commit robbery while armed with a deadly weapon. The defendant argues that the state failed to meet this burden and, in fact, was allowed to introduce a .22 caliber revolver into evidence without establishing its connection to the defendant.

"Evidence is not rendered inadmissible simply because it is not conclusive. It is admissible if it tends to support a relevant fact even in a slight degree, so long as it is not prejudicial or merely cumulative." *State* v. *Morrill*, 197 Conn. 507, 548, 498 A.2d 76 (1985). " '[A] trial court has broad discretion in determining whether the probative value of proffered evidence is outweighed by the prejudice that is likely to result from its admission. . . . We will not overturn the court's determination of this issue absent an abuse of discretion.' " *State* v. *Payne*, 31 Conn. App. 370, 374, 625 A.2d 231, cert. denied, 227 Conn. 901, 630 A.2d 73 (1993), quoting *State* v. *Busque*, 31 Conn. App. 120, 128–29, 623 A.2d 532 (1993), appeal dismissed, 229 Conn. 839, 643 A.2d 1281 (1994). We conclude that the trial court's ruling in the present case was well within its discretion.

At the trial, the state offered for identification, over the defendant's objection, three guns that had been obtained at a raid on 575 Winchester Avenue on February 27, 1991. One of these weapons, a .22 caliber revolver, was later introduced, over defendant's objection, as a full exhibit. The defendant argues that the admission of the .22 caliber revolver was unduly prejudicial to him because it was not established that it was in the defendant's possession at the time of the incident, nor was it connected to the bullet found in the victim's body. In support of this argument, the defendant points out that his fingerprints were not found on the gun and he was not tested for gunpowder residue. He also notes that he did not reside at 575 Winchester

Avenue and was not present when the guns were seized. The defendant also relies on the testimony of Edward McPhillips from the firearms section of the state police forensic laboratory. McPhillips testified that in March, 1991, he received the bullet that was taken from the victim and was asked to examine several weapons to determine whether the bullet was fired from any of them. He testified that because of the bullet's condition, he could not tell whether it was fired from the .22 caliber revolver. He further acknowledged that, according to a report by the Federal Bureau of Investigation, the bullet could not have come from the .22 caliber revolver. Finally, the defendant refers to the testimony of Fleming acknowledging that he had told the police that he had seen the defendant with a .25 caliber weapon on the night of the shooting.[9]

Although the testimony relied on by the defendant supports his position that the weapon was not connected to him, the record reveals additional testimony that identifies the .22 caliber revolver as the weapon used by the defendant to shoot the victim. As noted earlier, Edwards testified that he overheard a conversation between Fairweather and the defendant in which the defendant requested guns. Fairweather obtained several guns and gave them to the defendant. Edwards then identified two guns, including the .22 caliber revolver, as having been guns given to the defendant by Fairweather on the night in question. Edwards further testified that the defendant returned the guns two days later. James Harris, an inspector in the state's attorney's office, testified that Fairweather told him that he had given a .22 caliber revolver to the defendant, and that the defendant had returned it after a concert that had been performed on the night of the shooting. Fairweather testified that, sometime prior

---

[9] Fleming also denied that this statement was truthful.

to the shooting, the defendant asked him for a gun and Fairweather gave him a loaded .22 caliber revolver.[10]

We conclude that the trial court did not abuse its discretion in admitting the .22 caliber revolver into evidence. There was sufficient evidence connecting the defendant to the weapon and to the shooting of the victim. Therefore, it was relevant. We further conclude that the court correctly concluded that the probative value of the evidence was not outweighed by any prejudicial impact to the defendant.

### III

The defendant next argues that the court improperly delivered a missing witness instruction with regard to the failure of the defendant's mother to testify. Specifically, the defendant argues that the state did not prove that his mother was available, nor did it prove that she was a witness that the defendant would naturally produce. We disagree with the defendant, and conclude that the court properly delivered the requested instruction.

"The missing witness rule was stated in *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 165 A.2d 598 (1960). That rule provides that '[t]he failure of a party to produce a witness who is in his power to produce and who would naturally have been produced by him, permits the inference that the evidence of the witness would be unfavorable to the party's cause.' Id., 675. Two requirements must be fulfilled before a party is entitled to a *Secondino* charge: the witness must be available, and he must be a witness whom the party would naturally produce. Id. . . ." (Citation omitted.) *State* v. *Charlton*, 30 Conn. App. 359, 370, 620 A.2d 1297, cert. denied, 225 Conn. 922, 625 A.2d 824 (1993); see *State* v. *Grant*, supra, 221 Conn. 105.

---

[10] Fairweather further testified that the defendant returned the gun to him prior to the night of the shooting.

With regard to availability, the defendant argues, citing *State* v. *Wood*, 208 Conn. 125, 140, 545 A.2d 1026, cert. denied, 488 U.S. 895, 109 S. Ct. 235, 102 L. Ed. 2d 225 (1988), and *Shelnitz* v. *Greenberg*, 200 Conn. 58, 74–75, 509 A.2d 1023 (1986), that the state did not present any evidence that the defendant was able to produce his mother as a witness in court. The defendant makes this argument despite the testimony of his sister that his mother lived with her in New Haven and could testify.[11] We conclude, on the basis of the testimony of the defendant's sister, that the evidence established the requisite availability. See *State* v. *Daniels*, 180 Conn. 101, 110, 429 A.2d 813 (1980) (defendant's testimony that missing witness was "home, I guess" provided jury with sufficient evidence to support showing of availability); but see *State* v. *Wood*, supra, 140 (availability of missing witness for deposition but not for in-court appearance did not show that party was able to produce witness' presence in court).

The defendant further argues that because his mother's testimony would have been cumulative of the testimony provided by the other three alibi witnesses, she was not a witness whom the defendant would nat-

[11] The defendant's sister testified that on the night in question, the defendant came home at around 1:15 a.m. She further testified as follows:

"Q. Who else was home at the time?

"A. Me, my two kids, and my mother.

"Q. And what was your mother doing?

"A. She was in her living room watching TV.

"Q. So, she would have seen him come in too, wouldn't she?

"A. Yeah, she had to let him in the house.

"Q. And she still lives with you?

"A. Yes, she does.

"Q. And she's around, you saw her today, in fact?

"A. Yes, I did.

"Q. So, she can testify that it was 1:15 also?

"A. Yes, she was there."

urally produce.[12] He therefore argues that the court should not have given the missing witness instruction. As the court stated in *State* v. *Grant,* supra, 221 Conn. 106, however, "[t]he testimony of several witnesses in support of an alibi defense can hardly be characterized as unimportant or cumulative." See also *State* v. *Ruiz,* 202 Conn. 316, 324–25, 521 A.2d 1025 (1987). We therefore reject the defendant's claim that his mother's testimony would have been merely cumulative.[13]

## IV

The defendant next argues that the evidence was insufficient to establish the essential elements of conspiracy to commit first degree robbery pursuant to §§ 53a-134 (a) (2) and 53a-48. Specifically, the defendant argues that the state failed to prove the existence of an agreement, one of the essential elements of the crime of conspiracy.

"When we are called upon to review a sufficiency of the evidence claim, we impose a two part analysis. We first construe the evidence in the light most favorable to sustaining the verdict. . . . We next determine whether, from that evidence and all the reasonable inferences that flow from the evidence, a trier of fact could reasonably find that the defendant was guilty beyond a reasonable doubt." (Citations omitted; internal quotation marks omitted.) *State* v. *Patterson,* 35

---

[12] The defendant refers to the testimony of Pamela Swint, a "friend-acquaintance," and Mary Martin, an acquaintance and bartender at the Oasis Cafe on the night in question. Both witnesses testified that they saw the defendant at the Oasis Cafe on the night of the shooting. The defendant also refers to the testimony of his sister, Tonya Fleming, who stated that the defendant came home at approximately 1:15 a.m., and that at that time, their mother was at home watching television.

[13] In light of this conclusion, it is unnecessary for us to consider the defendant's claim that the trial court's error in giving the charge was harmful.

Conn. App. 405, 412–13, 646 A.2d 258, cert. denied, 231 Conn. 930, 649 A.2d 254 (1994).

" 'To prove the crime of conspiracy, in violation of § 53a-48, the state must establish beyond a reasonable doubt that an agreement existed between two or more persons to engage in conduct constituting a crime and that subsequent to the agreement one of the conspirators performed an overt act in furtherance of the conspiracy. *State* v. *Rouleau*, 204 Conn. 240, 258, 528 A.2d 343 (1987); *State* v. *Estrada*, 28 Conn. App. 416, 420, 612 A.2d 110, cert. denied, 223 Conn. 925, 614 A.2d 828 (1992). The state is also obligated to prove that the accused intended that conduct constituting a crime be performed. *State* v. *Rouleau*, supra [258]; *State* v. *Channer*, 28 Conn. App. 161, 168, 612 A.2d 95, cert. denied, 223 Conn. 921, 614 A.2d 826 (1992).' *State* v. *Hooks*, 30 Conn. App. 232, 241–42, 619 A.2d 1151, cert. denied, 225 Conn. 915, 623 A.2d 1025 (1993)." *State* v. *Jones*, 35 Conn. App. 839, 846–47, 647 A.2d 43 (1994).

In the present case, the defendant was charged with conspiracy to commit robbery in the first degree, by agreeing with Fleming, Jones and Newton to engage in or cause the performance of conduct constituting that crime. The overt act alleged was that "[t]he accused and coconspirators drove around parts of New Haven in the early morning hours of February 17, 1991, looking for a person to rob." The defendant argues, however, that the facts as presented to the jury "indicate that only the defendant was armed and only the defendant confronted the victim. Although, according to [Fleming's] recanted statement, everyone in the car knew of the defendant's pursuit, there is no evidence to demonstrate that there was an agreement that the purpose of riding in the car was to locate a victim."

"The existence of a formal agreement between the parties . . . need not be proved; it is sufficient to show

that they are knowingly engaged in a mutual plan to do a forbidden act. . . . Because of the secret nature of conspiracies, a conviction is usually based on circumstantial evidence. . . . Consequently, it is not necessary to establish that the defendant and his coconspirators signed papers, shook hands, or uttered the words 'we have an agreement.' . . . Indeed, a conspiracy can be inferred from the conduct of the accused." (Citations omitted.) *State* v. *Boykin*, 27 Conn. App. 558, 564–65, 609 A.2d 242, cert. denied, 223 Conn. 905, 610 A.2d 179 (1992).

From the evidence presented at trial, the jury reasonably could have found that the defendant had entered into an agreement with the occupants of the vehicle to rob someone. The defendant is correct in his assertion that mere presence at the scene of the crime, even coupled with knowledge of the crime, is not sufficient to establish guilt of a conspiracy; rather, evidence tending to show knowing participation in a conspiracy is also needed. *State* v. *Stellato*, 10 Conn. App. 447, 454, 523 A.2d 1345 (1987). Such evidence is present here.

The jury had before it the statement given by Fleming to the police, in which he stated that everyone in the car on the night in question knew that the defendant was going to rob someone and that they all remained in the car while the defendant confronted the victim. Furthermore, according to the statement, after the defendant returned to the car, Fleming asked him why he shot the victim when he had the wallet.

Construing the evidence in the light most favorable to sustaining the verdict, the jury reasonably could have

concluded that the defendant was guilty beyond a reasonable doubt of conspiracy to commit first degree robbery.

## V

The defendant's final argument is that there are compelling policy reasons for repudiating the *Secondino* rule as applicable in a criminal case. This argument warrants little discussion. The Supreme Court has stated that "[t]he *Secondino* rule applies to criminal prosecutions." *State* v. *Ross*, 230 Conn. 183, 209, 646 A.2d 1318 (1994). "This court will not reexamine or reevaluate Supreme Court precedent. Whether a Supreme Court holding should be reevaluated and possibly discarded is not for this court to decide." *State* v. *Reis*, 33 Conn. App. 521, 527, 636 A.2d 872, cert. denied, 229 Conn. 901, 640 A.2d 118 (1994).

The judgment is affirmed.

In this opinion the other judges concurred.