STATE OF CONNECTICUT *v.* LEONARD GREEN
(5828)

DUPONT, C. J., NORCOTT and FOTI, Js.

Argued May 31—decision released September 27, 1988

*Stephen M. Feinstein,* with whom, on the brief, was *Lionel DeSilva,* legal intern, for the appellant (defendant).

*Susann E. Gill,* assistant state's attorney, with whom, on the brief, was *Bruce Hudock,* assistant state's attorney for the appellee (state).

NORCOTT, J. The defendant appeals from the judgment of conviction, rendered after a jury trial, of the crimes of robbery in the first degree in violation of General Statutes § 53a-134 (a) (3)[1] and assault in the first degree in violation of General Statutes § 53a-59 (a) (1) and (2).[2] The defendant claims (1) that the trial court erred in admitting as substantive evidence the prior inconsistent written statement of a witness who testified at the trial, and (2) that the evidence produced at trial was insufficient to support the jury's verdict. We find no reversible error.

---

[1] General Statutes § 53a-134 (a) (3) provides in pertinent part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . uses or threatens the use of a dangerous instrument . . . ."

[2] General Statutes § 53a-59 (a) provides in pertinent part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument; or (2) with intent to disfigure another person seriously and permanently, or to destroy, amputate or disable permanently a member or organ of his body, he causes such injury to such person or to a third person."

From the evidence presented at trial, the jury could reasonably have found the following facts. On December 27, 1985, at approximately 2:30 a.m., George Peristides was working at the J & J Texaco gas station located on West Avenue in Norwalk. Peristides was sitting in the office at the gas station when he was suddenly struck with a blunt object by someone who had broken through the large glass window of the office. Peristides was rendered unconscious by the blow, which fractured his skull. The man who broke through the window then proceeded to inflict approximately forty cuts on Peristide's neck, to stab him five times and to take over $700 from the cash register before fleeing.

A customer later found Peristides lying in a pool of blood on the floor of the office around 2:50 a.m. According to medical testimony adduced at trial, the victim had been cut and stabbed with a knife at least four inches long. One knife slash had severed the victim's windpipe and pierced his thyroid gland. As a result of the attack, he suffered disfigurement of the neck and permanent deafness in the left ear.

At trial, Stephen Papadopolous, the father of the owner of the gas station, testified that he had seen a man whom he identified as the defendant hanging around the station prior to the robbery. The defendant was not a regular customer, and he was not pumping gas.

On the morning of the robbery between 2 and 2:30 a.m., Theresa Gerachi, a prostitute who was working in the area, saw the defendant, whom she had known for one year prior to the robbery, about two blocks from the gas station. Later, Gerachi was walking toward the gas station when she observed the defendant, known to her as "Bo," walking in the opposite direction. Gerachi also observed another man on the opposite side of the street running in the same direc-

tion as the defendant. Gerachi did not know the other man but heard him call to the defendant, "Bo, come on." Gerachi described the defendant as wearing beige khaki pants and a brown fur collared jacket.

At 7:20 on the morning of the robbery, police officers stopped the defendant to talk with him about the robbery. The defendant was wearing khaki pants. Thereafter, the defendant accompanied detectives Julian Lee and Gary Whetmore to the police station, where they interviewed him. During the course of the interview, the defendant maintained his innocence and claimed, as an alibi, that he had been at home sleeping continuously since 9 p.m. the previous evening.

The detectives testified that during the interview they noticed two stains on the defendant's pant leg. The defendant maintained that the stains were "fish sauce." The detectives then asked the defendant if they could make an impression of his boot, whereupon the defendant became "fidgety" and attempted surreptitiously to scrape some brown spots off of his left boot. Thereafter, the defendant consented to the detectives taking his clothing and boots for testing. Scientific testing later revealed that the stains on the defendant's pants and boots were human blood of the same type as that of the victim.

I

The defendant's first claim of error is that the trial court erred in admitting as substantive evidence the prior written out-of-court statement of a witness, David Fagan.[3]

The facts relevant to this claim are as follows. When first interviewed by the Norwalk police and at trial, the defendant maintained an alibi defense, claiming that

---

[3] As part of this claim, the defendant also asserts that the court erred in refusing to instruct the jury that they use the statement for impeachment purposes only.

he had been at home asleep during the time of the robbery. This defense was at odds with a statement given to the police by Fagan, who had known the defendant for fifteen years.

On January 19, 1986, while at the Norwalk police station on an unrelated matter, Fagan was questioned about the Texaco gas station robbery. In a written, signed and sworn statement given to the police that day, Fagan stated that he had seen the defendant and Oliver Fornay at Sneider's Pool Hall in Norwalk in the early morning hours of December 27, 1985. Fagan stated that the two men were discussing the purchase of drugs and that "the defendant pulled out a lot of money and said if he knew it was this easy, he would have done it a long time ago." In his statement, Fagan also indicated that the defendant "said it was easy to get into the place because all he had to do was kick the window in" and that the defendant "was saying this while he had the money in his hand and I was able to tell that he meant that he stole the money." As to Fornay, Fagan stated that Fornay advised the defendant to "keep it hush-hush," but the defendant kept talking about what he had done. The statement also included Fagan's assertion that the defendant never said he "did a robbery" but just that "he kicked the window in."

During its case-in-chief, the state called Fagan as a witness. Fagan testified that he had seen the defendant and Fornay at the pool hall around "four o'clock" on the day of the robbery, but he repudiated the statements he previously attributed to the defendant and Fornay even after the state attempted to refresh his recollection by showing him his prior written statement. Fagan admitted that he had signed the statement, but he denied having initialed two corrections on the statement. Fagan claimed at trial that he had not read the statement before signing it, and that he had only signed

it because the police threatened to withhold his personal belongings in his impounded car if he did not sign.

Thereafter, the state offered the written statement for substantive purposes as a prior inconsistent statement, arguing that our Supreme Court's decision in *State* v. *Whelan,* 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), rendered the statement admissible as substantive evidence. The defendant responded that the statement did not meet the *Whelan* guidelines because Fagan's testimony had raised the possibility of coercion and because Fagan did not have personal knowledge of the robbery and assault.

The trial court admitted the statement without reference to the *Whelan* decision, noting that "the evidence is already in." The court also declined to give an immediate limiting instruction to the jury regarding the use of the statement for impeachment purposes only, and refused similarly to charge the jury as requested by the defendant.

We begin our analysis of this claim by noting that prior to the adoption of the *Whelan* rule, this state followed the more orthodox view that a prior inconsistent statement of a non-party witness is inadmissible hearsay if offered to prove the truth of the matters asserted therein, and, therefore, is admissible only for impeachment purposes. *State* v. *Villafane,* 171 Conn. 644, 672, 372 A.2d 82 (1976), cert. denied, 429 U.S. 1106, 97 S. Ct. 1137, 51 L. Ed. 2d 558 (1977); *State* v. *Raffone,* 161 Conn. 117, 124, 285 A.2d 323 (1971); *Sears* v. *Curtis,* 147 Conn. 311, 315–17, 160 A.2d 742 (1960); C. Tait & J. LaPlante, Connecticut Evidence § 7.24. "The logic of this orthodox rule [was] that the prior inconsistent statement of a witness [was] too unreliable to be admitted as substantive evidence because the declarant was not (1) under oath and sub-

ject to punishment for perjury, (2) in the presence of the trier of fact, or (3) subject to cross-examination." *State* v. *Whelan,* supra, 749.

In *Whelan,* however, our Supreme Court noted that the orthodox view is the subject of much criticism. Many legal commentators argue that "the oath is not as strong as a guaranty of trustworthiness as it once may have been, and that the requirements that the jury observe the declarant and that the defendant have the opportunity to cross-examine are met where the declarant takes the stand and is subject to cross-examination. See, e.g., McCormick, Evidence (3d Ed. 1984) § 251; 3A Wigmore, Evidence (Chadbourn Rev. 1970) § 1018; Graham, 'Employing Inconsistent Statements for Impeachment and as Substantive Evidence,' 75 Mich. L. Rev. 1565 (1977)." *State* v. *Whelan,* supra, 749–50. In short, these commentators suggest that some prior inconsistent statements should be admissible for substantive purposes.

There appears to be a split, however, as to which prior inconsistent statements should be admissible. Some commentators suggest that any prior inconsistent statement should be admitted for substantive purposes if the witness can be subject to effective cross-examination. Comment, "Prior Inconsistent Statements as Substantive Evidence: Illinois Takes the Sting out of the Turncoat Witness," 19 J. Marshall L. Rev. 69, 88 (1985). Other commentators suggest, however, that only those prior inconsistent statements whose reliability is attested to by the circumstances surrounding the making of the statement should be admitted for substantive purposes. M. Graham, supra, 1584–85; see also C. McCormick, "The Turncoat Witness: Previous Statements as Substantive Evidence," 25 Tex. L. Rev. 573, 588 (1947).

Connecticut has chosen to align itself with those commentators who suggest that prior inconsistent statements only be made admissible for substantive purposes if the circumstances suggest that they are reliable. As our Supreme Court noted in *State* v. *Whelan,* supra, 752, "[a]lthough we are impressed by the logic of the modern view favoring substantive admissibility for all prior inconsistent statements where the defendant is in court and subject to cross-examination, we are unwilling to abrogate, without adequate precautions, the traditional view prohibiting their substantive use." The substantive use of a prior inconsistent statement is only allowed if (1) the statement is written and is signed by the declarant, (2) the declarant has personal knowledge of the facts stated, and (3) the declarant testifies at trial and is subject to cross-examination. Id., 753.

In this case, Fagan's prior inconsistent statement was written and signed. Fagan testified at trial and was subject to cross-examination by the defendant about the contents of the statement. We find, however, that Fagan did not have personal knowledge of all of the facts in the statement and that, therefore, those portions of the statement of which he had no personal knowledge were inadmissible for substantive purposes.

As we noted in the statement of facts relating to this issue, Fagan's prior statement which the state sought to introduce at trial was a mixed bag. Included within the statement were a number of personal observations by Fagan. These observations were clearly admissible under the *Whelan* rule. Also included in the statement, however, were several statements which the defendant allegedly made to Fagan implicating the defendant in the robbery. With regard to these statements, it is clear that Fagan did not have personal knowledge of the facts underlying them. Fagan was not at the

scene of the crime and did not personally know whether the defendant participated in the robbery in any capacity.

The state contends, however, that the statements should be admissible substantively because although Fagan did not have personal knowledge of the facts underlying the defendant's statements, he did have personal knowledge of the fact that the defendant made them. We disagree.

We begin our analysis of this argument by noting that our Supreme Court did not expound on the personal knowledge requirement in *State* v. *Whelan,* supra. The legal commentary surrounding the personal knowledge requirement, however, indicates that in order for a prior inconsistent statement to be admissible the declarant must have personal knowledge of the facts underlying third party statements and not just of the fact that the third party made those statements. Professor Graham noted that the personal knowledge requirement "excludes from evidence all prior statements of a witness that merely narrate a third person's declaration unless the witness also has personal knowledge of the facts underlying the third person's statement. Thus a witness' prior statement that he had heard a criminal defendant make an incriminating admission would be inadmissible as substantive evidence unless the witness had personal knowledge of the incriminating conduct itself." M. Graham, supra, 1584–85. Other commentators who have considered the personal knowledge requirement have reached the same conclusion. See C. McCormick, 25 Tex. L. Rev., supra, 588; comment, supra, 86.

Requiring the declarant to have personal knowledge of the incriminating conduct itself is consistent with the purpose behind the personal knowledge require-

ment. As acknowledged previously, the personal knowledge requirement was imposed to ensure the reliability of any prior inconsistent statement that is sought to be admitted as substantive evidence. A "double hearsay" statement, typified by the admission-confession of a criminal defendant to a third person who conveys that information to someone else, is the kind of evidence that courts have tended to view as unreliable. *United States* v. *Briggs,* 457 F.2d 908, 910 n.3 (2d Cir.), cert. denied, 409 U.S. 986, 93 S. Ct. 337, 34 L. Ed. 2d 251 (1972); M. Graham, supra, 1586. "[T]he risk of fabrication and distortion is significantly increased when a witness purports merely to repeat another's out-of-court declaration. It is always easier to say that X said something than to report personal observations of the event. Even if X did in fact tell the witness something, it would not be unusual for the person asserting to have overheard the out-of-court declaration to inject, intentionally or otherwise, additional or different statements into the conversation. Unfortunately, these fabricated or distorted statements will often be highly damaging admissions or confessions not easily discounted by the jury." Id., 1586–87 n.60.

Further, we would note that the witness could not be cross-examined concerning the facts underlying the admissions because he had no personal knowledge of those facts. He could only be cross-examined as to whether he heard the statements and that cross-examination would be fruitless because the witness would already have denied hearing the admission. Accordingly, we find that in order for a prior inconsistent statement containing statements of a third party to be admissible as substantive evidence the declarant must have personal knowledge of the facts underlying the statement and not just personal knowledge that the statement was made.

The state next contends that the statement should have been admitted under the catchall exception to the hearsay rule.

" '[H]earsay [otherwise inadmissible] may be admitted if there is a sufficient probability that the statement is reliable and trustworthy, if the evidence contained in the statement is necessary to resolution of the case, and if the trial court concludes that admitting the statement is in the interests of justice. 5 Wigmore, Evidence (Chadbourn Rev. 1974) § 1422, pp. 253–54.' " *State* v. *Sharpe,* 195 Conn. 651, 664, 491 A.2d 345 (1985), quoting *State* v. *Stepney,* 191 Conn. 233, 249–50, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984). As we noted in this case, however, the type of evidence sought to be introduced was the type which is inherently unreliable. There are no facts which would render this evidence so reliable as to warrant its admission into evidence.

Next we must determine whether the substantive admission of the statement into evidence constituted harmless error. We begin our harmless error analysis by noting that the error claimed in this case is not of constitutional dimension. *State* v. *Ruiz,* 202 Conn. 316, 329, 521 A.2d 1025 (1987). "When a trial error in a criminal case does not involve a constitutional violation the burden is on the defendant to demonstrate the harmfulness of the court's error. *State* v. *Ruth,* 181 Conn. 187, 196–97, 435 A.2d 3 (1980); *State* v. *L'Heureux,* [166 Conn. 312, 323, 348 A.2d 578 (1974)]. The defendant must show that it is more probable than not that the erroneous action of the court affected the result. *State* v. *Ruth,* supra; *State* v. *L'Heureux,* supra, 323–24." *State* v. *Artieri,* 206 Conn. 81, 88, 536 A.2d 567 (1988). In the present case, we conclude that the defendant has not met this burden.

The inadmissible statement contained what was tantamount to an admission of the defendant's participa-

tion in the crime. The remaining evidence against the defendant which the state produced at trial, while primarily circumstantial, was abundant. That evidence put the defendant in the vicinity of the gas station at or near the time when the crime was committed. The evidence also was in direct contradiction to the defendant's alibi defense that he was at home asleep during the time immediately after the robbery. The remaining evidence also demonstrated that the defendant was seen flashing a large amount of money a short while after the crime was committed and at the time he claimed to be sleeping. Further, the evidence demonstrated that the defendant had blood stains on his pants and on his boot which matched the victim's blood type and that he had ground glass in his boot.

We find that the state's case against the defendant is "sufficiently strong to overcome the probability that [the erroneously admitted statement], when added to the state's other evidence, [was] a decisive factor in the result." Id., 89–90. The erroneous admission of the prior inconsistent statement for substantive use was not likely to have affected the result in this case, and, accordingly, we find the error to be harmless.

## II

The defendant's final claim is based on the insufficiency of the evidence to support the verdict. The relevant inquiry, when a claim on appeal challenges the sufficiency of the evidence, is whether " 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *State* v. *Scielzo,* 190 Conn. 191, 197, 460 A.2d 951 (1983). As we noted in part I, the evidence which was properly admitted in this case was sufficient to sustain the jury's verdict.

There is no error.

In this opinion the other judges concurred.