## STATE OF CONNECTICUT *v.* ROGER WOODSON
## (14448)

PETERS, C. J., CALLAHAN, BORDEN, BERDON and NORCOTT, Js.

1

Argued March 26—decision released August 3, 1993

*Susan M. Hankins,* assistant public defender, with whom, on the brief, was *G. Douglas Nash,* public defender, for the appellee (defendant).

*Rita M. Shair,* assistant state's attorney, with whom were *Michael Dearington,* state's attorney, and *Elpedio Vitale,* assistant state's attorney, for the appellee (state).

CALLAHAN, J. This appeal concerns several issues arising out of the criminal trial of the defendant, Roger Woodson. The state charged the defendant with two counts of arson in the first degree in violation of General Statutes § 53a-111 (a) (3) and (4), respectively,[1] one

---

[1] "[General Statutes] Sec. 53a-111. ARSON IN THE FIRST DEGREE: CLASS A FELONY. (a) A person is guilty of arson in the first degree when, with intent to destroy or damage a building, as defined in section 53a-100, he starts a fire or causes an explosion, and (1) the building is inhabited or occupied or the person has reason to believe the building may be inhabited or occupied; or (2) any other person is injured, either directly or indirectly; or (3) such fire or explosion was caused for the purpose of collecting insur-

count of conspiracy to commit arson in the first degree in violation of General Statutes §§ 53-111 and 53a-48,[2] and one count of insurance fraud in violation of General Statutes § 53a-215 (a) (2).[3] A jury returned a verdict of guilty of both counts of arson in the first degree and one count of insurance fraud and the court rendered judgment accordingly. Following the defendant's convictions, the court sentenced him to an effective term of imprisonment of twenty-five years.[4] He appeals to this court pursuant to General Statutes § 51-199 (b) (3).[5] We affirm the judgment of the trial court.

ance proceeds for the resultant loss; or (4) at the scene of such fire or explosion a peace officer or firefighter is subjected to a substantial risk of bodily injury.

"(b) Arson in the first degree is a class A felony."

[2] "[General Statutes] Sec. 53a-48. CONSPIRACY. RENUNCIATION. (a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy.

"(b) It shall be a defense to a charge of conspiracy that the actor, after conspiring to commit a crime, thwarted the success of the conspiracy, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose."

[3] General Statutes § 53a-215 (a) (2) provides: "A person is guilty of insurance fraud when he, with the intent to injure, defraud or deceive any insurance company . . . (2) assists, abets, solicits, or conspires with another to prepare or make any written or oral statement that is intended to be presented to any insurance company in connection with, or in support of, any application for any policy of insurance providing coverage for loss or damage to real or personal property caused by fire or any claim for payment or other benefit pursuant to such policy of insurance, knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such application or claim for the purposes of defrauding such insurance company."

[4] The defendant was sentenced to concurrent terms of twenty-five years each on the two arson counts and a concurrent term of one year on the single count of insurance fraud.

[5] General Statutes § 51-199 (b) (3) provides: "The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years."

The jury could reasonably have found the following facts. The charges arose out of an incendiary fire that caused extensive damage to a residence located on 132 Lamberton Street in New Haven. The defendant was in the business of buying, renovating and reselling real estate. He claimed to own several properties with his mother, Lula Woodson. One of those properties was located at 132 Lamberton Street. The Lamberton Street property had been financed with two outstanding mortgages that the defendant had difficulty paying because of financial losses he had suffered in the stock market. The defendant failed to make mortgage payments from May through September, 1989, to one of the mortgagees, New Haven Savings Bank, which then had initiated foreclosure proceedings in October, 1989, to recoup an outstanding debt of $59,088. The defendant feared that he would lose 132 Lamberton Street by foreclosure.

The defendant attempted to sell 132 Lamberton Street by listing it, together with other properties, with Howard Greenberg, a real estate agent, for a price of $79,000. On September, 17, 1989, a buyer signed a purchase and sale agreement for 132 Lamberton Street for a purchase price of $69,000 and a closing date was set for October 30, 1989.[6] The prospective buyer, however, had been unable to obtain the necessary financing to purchase the property by the date of the original closing. The defendant granted the prospective buyer a two week extension beyond the original closing date to obtain the necessary financing but other problems had still plagued the sale.

On October 18, 1989, the defendant obtained a fire insurance policy in the amount of $120,000 in his mother's name on 132 Lamberton Street with the Dor-

---

[6] The defendant and his mother were listed as sellers on the purchase and sale agreement.

chester Mutual Insurance Company. In early November, the defendant contacted Grace Hudson, an employee of Allstate Insurance Company, to inquire about insurance for the same property. On November 9, 1989, the defendant visited Hudson at her office, and placed a binder on a fire insurance policy for 132 Lamberton Street in the amount of $125,000. The defendant signed his mother's name to the binder. After the fire, the defendant submitted proofs of loss, signed by his mother, to both the Dorchester and Allstate Insurance companies.

The fire, in connection with which the defendant was charged, occurred during the early morning hours of November 10, 1989. At 5:33 a.m., members of the New Haven fire department were notified that a fire had broken out at a residence located at 132 Lamberton Street. Upon arriving at the scene, the firefighters found the residence enveloped in thick, black smoke. Fire Lieutenant John King testified that when he had searched the house for victims, he had noticed a can of gasoline and "pour patterns" running across the carpet. After the fire had abated significantly, King removed his oxygen mask and detected the odor of a petroleum product. King also observed that the fire had three separate unconnected "points of origin" rather than the usual one point, which is characteristic of accidental fires. Edward Joss, a member of the arson squad, investigated the fire immediately after it had been suppressed and noted pour patterns on the carpet and evidence that someone had spread some type of fuel on a wall in the living room. Jack Hubball, a forensic expert, inspected the container found at the scene of the fire and confirmed the fact that it had contained a petroleum liquid. Because an accelerant was present in the house, King concluded that the firefighters faced a significantly increased risk of injury at the scene.

On appeal, the defendant claims that the trial court improperly: (1) deprived the defendant of his constitutional right against double jeopardy by allowing his conviction of two counts of arson in the first degree in violation of General Statutes § 53a-111 (a) (3) and (4), respectively, for the same incident; (2) admitted evidence of threats made by the defendant to burn other of his properties not the subject of the present charges; (3) admitted the tape-recorded statement of a state's witness; and (4) denied the defendant's constitutional right to a fair trial by rebuking the defendant for being nonresponsive during the state's cross-examination.

I

The defendant first claims that he was deprived of his right against double jeopardy, as guaranteed by the fifth and fourteenth amendments to the United States constitution, because he was convicted of arson for violations of § 53a-111 (a) (3) and (4), respectively, for the same alleged acts. The defendant argues that the two statutory provisions of which he was convicted are not separate crimes but rather alternative methods for committing the single crime of arson in the first degree. The defendant maintains that, although he did not articulate a constitutional claim concerning this issue at trial, his claim is entitled to appellate review.

A defendant can prevail on an unpreserved claim only if "*all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823

(1989). We conclude that the defendant has not satisfied the third prong of *Golding* and therefore cannot prevail on his double jeopardy claim.

"The double jeopardy clause of the fifth amendment to the United States constitution provides: '[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb.' The double jeopardy clause is applicable to the states through the due process clause of the fourteenth amendment. *Benton* v. *Maryland,* 395 U.S. 784, 794, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969); *State* v. *Lonergan,* 213 Conn. 74, 78, 566 A.2d 677 (1989), cert. denied, 496 U.S. 905, 110 S. Ct. 2586, 110 L. Ed. 2d 267 (1990). This constitutional guarantee prohibits not only multiple trials for the same offense, but also multiple punishments for the same offense in a single trial. *Brown* v. *Ohio,* 432 U.S. 161, 165, 97 S. Ct. 2221, 53 L. Ed. 2d 187 (1977); *State* v. *Anderson,* 212 Conn. 31, 35, 561 A.2d 897 (1989); *State* v. *John,* 210 Conn. 652, 693, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989)." *State* v. *Greco,* 216 Conn. 282, 289–90, 579 A.2d 84 (1990).

The defendant's claim that he was improperly convicted of two counts of arson in the first degree under § 53a-111 (a) (3) and (4) involves that aspect of double jeopardy analysis that protects against imposing multiple punishments for the same offense in a single trial. "Double jeopardy analysis in the context of a single trial is a two-step process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met." (Internal quotation marks omitted.) Id., 290–91. There is no dispute in this case that the two arson counts with which the defendant was charged concern the same transaction. The charging documents reveal that both violations arose out of an

incendiary fire at 132 Lamberton Street at approximately 5:34 a.m. on November 10, 1989. Both counts of the information charging the defendant with arson in the first degree, moreover, allege the same conduct by the defendant and the same intent to destroy or damage a building.[7] Thus, the question presented is whether arson in the first degree in violation of § 53a-111 (a) (3) and arson in the first degree in violation of § 53a-111 (a) (4) are the same offense for the purposes of the double jeopardy clause.

The test for determining whether two charged offenses constitute the same offense for double jeopardy purposes was set forth in *Blockburger* v. *United States,* 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932). "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. Id., 304; *State* v. *John,* supra, 695. In conducting this inquiry, we look only to the relevant statutes, the information, and the bill of particulars, not to the evidence presented at trial." (Internal quotation marks omitted.) *State* v. *Greco,* supra, 291; *State* v. *John,* supra. "The issue,

---

[7] The information charged: "[O]n or about the 10th day of November, 1989, at approximately 5:34 a.m., at a location known as 132 Lamberton Street, the said Roger Woodson did, with intent to destroy or damage a building, start a fire or cause an explosion and such fire or explosion was caused for the purpose of collecting insurance proceeds for the resultant loss, said conduct being in violation of § 53a-111 (a) (3) of the Connecticut General Statutes.

"*Second Count* And the Attorney aforesaid further accuses Roger Woodson of Arson in the First Degree and charges that at the City of New Haven, on or about the 10th day of November, 1989, at approximately 5:34 a.m., at a location known as 132 Lambert Street, the said Roger Woodson did, with intent to destroy or damage a building, start a fire or cause an explosion and at the scene of such fire or explosion a peace officer or fire fighter was subjected to a substantial risk of bodily injury, said conduct being in violation of § 53a-111 (a) (4) of the Connecticut General Statutes."

though essentially constitutional, becomes one of statutory construction." *State* v. *Rawls*, 198 Conn. 111, 120, 502 A.2d 374 (1985); *State* v. *Madera,* 198 Conn. 92, 109, 503 A.2d 136 (1985).

Applying the *Blockburger* test, we conclude that the violations of § 53a-111 (a) (3) and (4) of which the defendant was convicted are separate offenses because each of these subdivisions of § 53a-111 (a) requires proof of a fact that the other does not. In particular, § 53a-111 (a) (3) requires the state to prove that the defendant started or caused an explosion "for the purpose of collecting insurance proceeds for the resultant loss," while § 53a-111 (a) (4) requires the state to prove that "at the scene of such fire or explosion a peace officer or firefighter is subjected to a substantial risk of bodily injury." Subdivision (3) of § 53a-111 (a) thus requires proof of an intent to defraud, while subdivision (4) requires proof that a peace officer or firefighter was subjected to a substantial risk of injury. Consequently, the proof necessary for the conviction under each of the two provisions differs markedly. We conclude, in accordance with *Blockburger,* that subdivisions (3) and (4) of § 53a-111 (a) are separate and distinct offenses.

This conclusion is consistent with our decision in *State* v. *Tweedy,* 219 Conn. 489, 594 A.2d 906 (1991). In *State* v. *Tweedy,* supra, the defendant was charged with and convicted of two counts of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A) and (B). Section 53a-92 (a) (2) (A) and (B) provide: "A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually; or (B) accomplish or advance the commission of a felony." The defendant in *Tweedy* argued that his conviction of two counts of kidnapping amounted to double punishment for the same offense and therefore

violated his right against double jeopardy. In reviewing his claim, we assumed "that the offenses arose from the same transaction," but determined that each count of first degree kidnapping "required proof of an element that the other did not." Id., 495, 496. Consequently, we concluded that the trial court properly punished the defendant on both counts of the information charging first degree kidnapping without violating the defendant's right not to be subjected to double jeopardy. Id., 496.

The defendant argues, however, that *Tweedy* is distinguishable from the present case. He claims that the statutory provisions at issue in *Tweedy* required proof of two separate criminal objectives and independent underlying criminal activity supporting each. The defendant maintains, conversely, that because neither subdivision (3) nor (4) of § 53a-111 (a) requires proof of separate underlying "acts or dual intents," those two provisions are not separate offenses but simply alternative methods of committing the same crime. We are not persuaded. Nowhere in *Tweedy* did we mandate such a restrictive construction of *Blockburger*. In *Tweedy*, rather, we relied upon the standard *Blockburger* analysis when, quoting *State* v. *Vass*, 191 Conn. 604, 615, 469 A.2d 767 (1983), we said that "[u]nder the *Blockburger* test, 'a defendant may be convicted of two offenses arising out of the same criminal incident if each crime contains an element not found in the other.' " *State* v. *Tweedy*, supra, 495. The term "element" as used in the *Blockburger* analysis in *Tweedy* means any fact that the legislature has deemed essential to the commission of the crime. *Blockburger* v. *United States*, supra, 304; *State* v. *Greco*, supra, 291; *State* v. *John*, supra, 695; *State* v. *Palmer*, 206 Conn. 40, 52, 536 A.2d 936 (1988). Contrary to the defendant's contention, the phrase "proof of a fact which the other does not"; *Blockburger* v. *United States*, supra; has never been

limited to apply only to the "dual acts or intents" of the accused for the purpose of double jeopardy analysis, and we decline to do so now.

The defendant nonetheless claims that, regardless of the outcome of the *Blockburger* analysis as applied to subdivisions (3) and (4) of § 53a-111 (a), because those provisions are subdivisions of the same statute rather than separate statutes, the legislature could not have intended to create separate offenses or to authorize separate penalties, but sought merely to codify alternative methods of committing the same crime. The defendant contends, in effect, that had the legislature intended to create two different crimes, it would necessarily have placed the elements of each course of conduct constituting arson in the first degree in discrete sections of the General Statutes. We disagree.

Although the *Blockburger* analysis is not controlling "when the legislative intent is clear from the face of the statute or the legislative history"; *Garrett* v. *United States,* 471 U.S. 773, 779, 105 S. Ct. 2407, 85 L. Ed. 2d 764 (1985); *Missouri* v. *Hunter,* 459 U.S. 359, 368, 103 S. Ct. 673, 74 L. Ed. 2d 535 (1983); *Albernaz* v. *United States,* 450 U.S. 333, 340, 101 S. Ct. 1137, 67 L. Ed. 2d 275 (1981); *Whalen* v. *United States,* 445 U.S. 684, 691–92, 100 S. Ct. 1432, 63 L. Ed. 2d 715 (1980); *Beam* v. *Foltz,* 832 F.2d 1401, 1411 (6th Cir. 1987), cert. denied, 485 U.S. 980, 108 S. Ct. 1278, 99 L. Ed. 2d 489 (1988); *State* v. *Greco,* supra, 293; *State* v. *John,* supra, 695–97; the mere position of statutory language in the hierarchy of sections and subsections in the penal code does not control whether such language creates a separate offense for the purpose of double jeopardy analysis. The defendant's assertion is in fact contradicted by our decision in *Tweedy,* wherein subparagraphs (A) and (B) of § 53a-92 (a) (2) were regarded as separate crimes for double jeopardy purposes even though they occupied the same statutory section. If two

subparagraphs in the kidnapping statute can be regarded as separate crimes, it follows apodictically that subdivisions (3) and (4) of § 53a-111 (a) can likewise be regarded as separate crimes for double jeopardy purposes despite their enactment as subdivisions of the same statute.

Ultimately, whether statutory provisions are separate crimes meriting separate punishments for the purpose of double jeopardy analysis turns on whether the legislature intended them to be separate crimes. Although the location of statutory provisions in the penal code may be some evidence of legislative intent, the language of the provisions rather than where they are situated is more indicative of whether the legislature intended to create separate crimes and separate punishments. Specifically, the language of § 53a-111 (a) (3) and (4) evinces that each provision was designed to protect separate and distinct interests of society. Cf. *State* v. *Greco,* supra, 295; *State* v. *Couture,* 194 Conn. 530, 566, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985). The obvious purpose of subdivision (3) is to prevent and punish fraud against the fire insurance industry, fraud for which the public pays in the long run. In contrast, the purpose of subdivision (4) is to protect the life and limb of those public servants charged with the dangerous duty of fighting fires. The two subdivisions therefore are directed at and punish distinct societal harms that do not necessarily coexist in every arson in the first degree.

We conclude from an examination of the language and the purposes behind § 53a-111 (a) (3) and (4) that the legislature intended to legislate separate and distinct crimes entailing separate punishments. Because conviction and punishment for crimes intended by the legislature to be separate and distinct do not result in

a double jeopardy violation, the defendant, under the third prong of *Golding*, cannot prevail on his unpreserved claim.

## II

The defendant next claims that the trial court improperly admitted evidence of threats that he would burn other properties not the subject of the present charges. The defendant specifically argues that the evidence was irrelevant, more prejudicial than probative, and that its prejudicial effect was not cured by a limiting instruction. We disagree.

At trial, the state called Theodore Piasyck, Jr., as a witness. Piasyck testified that the defendant, in conversations with him, had threatened to set fire to properties he owned on Lawrence Street, Shepherd Avenue, Jones Farm Road, Elm Street and Willow Street. These threats were conveyed to him in the context of several business meetings that the defendant had with Piasyck.

In February, 1989, the defendant had contacted Piasyck, who owned a second mortgage company, in order to obtain financing to purchase property on 6 Jones Farm Road, North Haven. Piasyck had agreed to finance the defendant's purchase of the Jones Farm Road property. The defendant had then sought and obtained financing from Piasyck for his other properties. Piasyck testified that shortly after he had financed the properties, the defendant had had difficulty making the required mortgage payments.[8] Several checks that Piasyck had received as mortgage payments from the defendant had, in fact, been returned because of insufficient funds. As a result, Piasyck had discussions with the defendant concerning the possibility of Pia-

---

[8] Piasyck later testified that he had subsequently restructured the financing to require blanket mortgages on all the defendant's properties.

syck acquiring some of the defendant's properties in order to satisfy the defendant's debt. Piasyck stated that at times these discussions had grown quite heated and that he and the defendant had "reached many sticky points" concerning the financial arrangements.

At that point in Piasyck's testimony, the court excused the jury to hear an offer of proof concerning Piasyck's anticipated testimony concerning threats made by the defendant to burn several of his properties that Piasyck had financed. Out of the presence of the jury, the defendant objected to the admission of the expected testimony. He argued that the evidence was irrelevant and more prejudicial than probative. The trial court discussed with counsel the admissibility of Piasyck's testimony and concluded that his testimony was properly admissible as an admission by the defendant.

After the jury returned, Piasyck testified that on three or four different occasions the defendant had threatened that if Piasyck did not acquire the properties, the defendant would burn them. The trial court thereafter instructed: "[T]his is the question with respect to the conversations with this gentleman by the defendant about the fires. And at this time, I want to instruct you folks that I have allowed this question to be asked and I've allowed the question to be answered. However, you are the people, you are the jury, you are the folks that have to determine. Remember, I told you before that the facts have to be weighed by you people; I take care of the law. You have to weigh the facts. So with respect to the conversation with respect to what Mr. Woodson was to have said to this gentleman, you must determine from all the facts in the case and everything you heard whether he said it, whether he didn't say it, what it meant, what it's applicable to at all. Take into consideration all the other facts that you've heard in the case. Do you follow me on that? All set on that?"

On appeal, the defendant claims that Piasyck's testimony concerning the defendant's threats to burn his other properties was irrelevant to whether he had committed arson at 132 Lamberton Street. We disagree and conclude that the evidence constituted an admission by a party and was correctly allowed into evidence. Further, we agree with the trial court that the weight to be attached to such evidence was a matter for the jury, and not the court, to decide.

"Among the recognized exceptions to the hearsay exclusionary rule is that for admissions of a party." *State* v. *Stepney,* 191 Conn. 233, 250, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984), citing *State* v. *DeMatteo,* 186 Conn. 696, 702, 443 A.2d 915 (1982); C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 11.5.1, p. 330; C. McCormick, Evidence (3d Ed. 1984) § 262, pp. 774–75. " '[S]tatements made out of court by a party-opponent are universally deemed admissible when offered against him'; 4 Wigmore, Evidence (Chadbourn Rev. 1972) § 1048, p. 2; so long as they are relevant and material to issues in the case." *State* v. *Stepney,* supra, 251. "[T]he vast weight of authority, judicial, legislative, and scholarly, supports the admissibility *without restriction of any statement of a party offered against that party at trial.*" Id.

The trial court, therefore, correctly ruled that Piasyck's testimony was admissible because the defendant's threats were an admission, that is, an " ' "avowal or acknowledgment [by the defendant] of a fact or of circumstances from which guilt *may* be inferred . . . ." ' " (Emphasis in original.) Id., 250. Further, to qualify as an admission, the defendant's threats did not necessarily have to be inconsistent with a position he had taken at trial.[9] Id.

---

[9] The defendant claims that the evidence concerning his threats to set fire to several properties if the witness did not purchase them constituted prior misconduct evidence, which is generally inadmissible. We disagree.

The trial court also properly determined that the evidence was relevant to material issues in the trial of the charged offenses. "[E]vidence is relevant if it has a tendency to establish the existence of a material fact." *State* v. *Mastropetre,* 175 Conn. 512, 517, 400 A.2d 276 (1978). " 'One fact is relevant to another fact whenever, according to the common course of events, the existence of the one, taken alone or in connection with other facts, renders the existence of the other either certain or more probable. Unless excluded by some rule or principle of law, any fact may be proved which logically tends to aid the trier in the determination of the issue. . . . No precise and universal test of relevancy is furnished by the law, and the question must be determined in each case according to the teachings of reason . . . .' " *State* v. *Sharpe,* 195 Conn. 651, 659, 491 A.2d 345 (1985).

Piasyck's testimony that the defendant had made threats that he would set fire to certain properties that he had owned was relevant to establish the defendant's state of mind at the time he was alleged to have set fire to the property on 132 Lamberton Street. Specifically, as part of the state's burden of proof concerning the defendant's alleged violation of § 53a-111 (a) (3), the state had to prove beyond a reasonable doubt that the defendant possessed the intent to defraud an insurance company by setting fire to the Lamberton Street residence. The evidence in dispute sheds light on that issue. Therefore, the trial court properly concluded that the statements were relevant admissions by the defendant.

See *State* v. *Sierra,* 213 Conn. 422, 428–29, 568 A.2d 448 (1990). The evidence concerned, rather, a threat with relevance to the defendant's motive and intent. The evidence was not of any act or conduct whatsoever. Because we consider the evidence as properly characterized as an admission by the defendant, and not evidence of prior misconduct, we do not address this claim.

The defendant argues, however, that even if his threats were relevant, they were more prejudicial than probative. "Prejudice is not measured by the significance of the evidence which is relevant but by the impact of that which is extraneous." *State* v. *DeMatteo,* supra, 703. Although the defendant's threats to set fire to his other properties were obviously damaging to his position at trial, that damage should not be confused with unfair prejudice. "All adverse evidence is damaging to one's case, but it is inadmissible only if it creates 'undue' prejudice so that it threatens an injustice were it to be admitted." C. Tait & J. LaPlante, supra, (Sup. 1992) pp. 87–88. The evidence of the defendant's threats to burn his other properties was probative of the state's version of the defendant's crimes, a version that postulated a desperate man capable of desperate means to salvage his financial situation. The force of the evidence was compelling because it bore significantly on the defendant's apparently conscious resolve to set fires, if necessary, to prevent financial loss. The trial court correctly ruled that the defendant's threats to Piasyck were admissible.

"The trial court's discretionary determination that the probative value of evidence is not outweighed by its prejudicial effect will not be disturbed on appeal unless a clear abuse of discretion is shown. *State* v. *King,* 216 Conn. 585, 603, 583 A.2d 896 (1990)." *State* v. *Joly,* 219 Conn. 234, 253, 593 A.2d 96 (1991). We note that "[b]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling. . . ." (Internal quotation marks omitted.) *State* v. *Shindell,* 195 Conn. 128, 136, 486 A.2d 637 (1985). After examination of the record, we conclude that the trial court did not abuse its discretion by admitting Piasyck's testimony concerning the defendant's threats.[10]

[10] The defendant claims that the trial court did not conduct a balancing procedure concerning whether the disputed statements were more preju-

Moreover, the trial court properly instructed the jury that the weight to be accorded this evidence was a matter to be determined by the jury and not by the court. This claim of the defendant is without merit.

## III

The defendant next claims that the trial court improperly admitted evidence of a tape-recorded statement of a state's witness concerning the witness' knowledge of the defendant and his connection with the arson at 132 Lamberton Street. The defendant argues that because the tape-recorded statement was not made under oath, was unsigned and was later repudiated by the witness, it did not possess the necessary criteria of reliability required for admissibility by *State* v. *Whelan,* 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). The defendant further maintains that the damaging effect of the admission of this evidence was not cured by the trial court's instruction to the jury allowing its substantive use. As a consequence of these alleged improprieties, the defendant claims violations of his right to confrontation, cross-examination, and due process under the fifth, sixth and fourteenth amendments to the federal constitution and article first, §§ 7 and 8, of the Connecticut constitution.[11] We disagree.

dicial than probative. We disagree. The fact that the trial court did not utter the talismanic response that this evidence is "more probative than prejudicial" hardly indicates that it did not make such a determination, especially since, out of the presence of the jury, the trial court listened to extensive argument concerning the prejudicial effect of this evidence as compared to its probative value. See *State* v. *Nardini,* 187 Conn. 513, 447 A.2d 396 (1982).

[11] The sixth amendment to the United States constitution, as applied to the states in *Pointer* v. *Texas,* 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965), provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."

Because the defendant fails to brief or analyze independently any state

The following facts are relevant to this issue. At trial, a witness for the state, Wallace A. Coleman, a business acquaintance of the defendant, testified that in November, 1989, shortly after the fire at 132 Lamberton Street, he had given a tape-recorded statement to the New Haven police. Coleman, who was subpoenaed to testify, said that he could not remember what he had told the police at the time concerning his knowledge of the defendant's connection with the fire. After he had been presented with a written version of his tape-recorded statement, he was asked if his recollection had been refreshed concerning the statements he had made to the police in November, 1989. Again, he stated that he could not recall what he had said to the police at that time relating to the defendant and the fire at 132 Lamberton Street. He then blurted out that his life had been threatened.

The court excused the jury, and out of its presence, the state made an offer of proof, pursuant to *State* v. *Whelan,* supra, seeking to admit the tape recording of Coleman's statement previously made to the police. The tape was played to the court, both counsel, and Coleman. The state argued that there was inconsistency between what the witness had said in court and his taped statement because the witness had just disavowed any knowledge of the subject matter of the prior statement. Defense counsel responded that the tape was inadmissible because there was no inconsistency. The trial court admitted the tape into evidence and had portions of it played for the jury.[12]

The defendant claims on appeal that the tape-recorded statement to the police, because it was unsigned, unsworn, and later repudiated by the wit-

constitutional protections, we limit our review to the relevant federal constitutional claim. *State* v. *Joly,* 219 Conn. 234, 258 n.16, 593 A.2d 96 (1991).

[12] The jury was also presented with a redacted copy of the transcription of the tape recording.

ness, did not possess the indicia of reliability required by *State* v. *Whelan,* supra, for admission and was therefore improperly admitted into evidence by the trial court. In *Whelan,* we departed from the common law rule prohibiting the substantive use of prior inconsistent statements. Among the reasons prompting this departure was that "when the declarant is in court, under oath, and subject to cross-examination before the factfinder concerning both his out-of-court and in-court statements, 'the usual dangers of hearsay are largely nonexistent . . . .' " Id., 750–51, quoting *California* v. *Green,* 399 U.S. 149, 155, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970); see also *State* v. *Buster,* 224 Conn. 546, 556, 620 A.2d 110 (1993). "The jury can, therefore, determine whether to believe the present testimony, the prior statement, or neither. Moreover, prior statements are, necessarily, made closer to the event in question, when memories are fresher and when there is less likelihood that the statement is the product of corruption, false suggestion, intimidation or appeals to sympathy." *State* v. *Whelan,* supra, 750.

Consequently, in *Whelan,* we created an exception to the hearsay rule in order "to admit for substantive purposes prior inconsistent statements given under prescribed circumstances reasonably assuring reliability." Id., 752. The prescribed circumstances articulated in *Whelan* for the admissibility of prior inconsistent statements made in *writing* are that "the declarant: (1) signs the statement; (2) has personal knowledge of the facts stated; and (3) testifies at trial and is subject to cross-examination." *State* v. *Buster,* supra, 556.

Although the witness testified at trial and was subject to cross-examination, the defendant asserts that Coleman's statement, although it had been tape-recorded, lacked reliability because it was unsworn and unsigned, did not concern a subject about which the witness had personal knowledge, and was later repudi-

ated by the defendant. We disagree. Contrary to the defendant's assertion, our decision in *Whelan* did not require that the declarant take an oath in order for the court to allow the admission of prior inconsistent statements into evidence for substantive purposes.[13] Likewise, the defendant's claim that the tape-recorded statement was unreliable because the witness, at trial, repudiated the statement is without merit. That the witness repudiated his earlier statement merely demonstrates that his statements were indeed inconsistent with his trial testimony.

Moreover, the absence of the witness' signature on the statement made to the police does not make it unreliable. It must be remembered that *State* v. *Whelan,* supra, specifically set forth criteria for the use of prior inconsistent *written* statements. In the context of such statements, it is understandable that the declarant's signature, although "not an absolute guaranty of reliability . . . does provide significant assurance of an accurate rendition of the statement and that the declarant realized it would be relied upon." Id., 754. The prior statement Coleman made to the police, however, was tape-recorded. Although the general rationale of *Whelan* concerning written statements also applies to tape-recorded statements; *State* v. *Alvarez,* 216 Conn. 301, 313, 579 A.2d 515 (1990); the requirement that such statements be signed is unnecessary because the recording of the witness' voice imparts the same measure of reliability as a signature. *State* v. *Whelan,* supra, 754 n.9.

The defendant also argues, citing *State* v. *Green,* 16 Conn. App. 390, 397, 547 A.2d 916 (1988), that Cole-

---

[13] Indeed, our decision in *State* v. *Whelan,* 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), which created an exception to the hearsay rule for prior inconsistent statements made out-of-court, was motivated in part by the fact that "the oath is not as strong a guaranty of trustworthiness as it once may have been . . . ." Id., 749.

man's statement was inadmissible because Coleman did not have direct personal knowledge of the incriminating facts underlying the admissions of the defendant that he had conveyed to the police in his tape-recorded statement. The defendant specifically claims that the witness lacked personal knowledge because he had not witnessed any of the events pertaining to the arson and simply heard about the arson from the defendant himself. In *State* v. *Grant,* 221 Conn. 93, 99, 602 A.2d 581 (1992), however, we concluded "that the 'personal knowledge' prong of the *Whelan* rule does not require that the declarant have witnessed the commission of the crime that is the subject of the prior inconsistent written or recorded statement." If the substance of the prior inconsistent statement of a witness is an admission made by the defendant to the witness, the witness has "personal knowledge" of that admission, within the meaning of *Whelan.* Thus, as long as the witness' statement meets the other requirements for admissibility under *Whelan,* and the words spoken by the defendant to the witness, as related in the witness' prior statement, would be admissible as an admission by the defendant if testified to by the witness, the "personal knowledge" prong of *Whelan* is satisfied. See *State* v. *Grant,* supra; *State* v. *Almeda,* 211 Conn. 441, 560 A.2d 389 (1989).

The tape-recorded statement that Coleman made to the police satisfies this test. In that statement, Coleman related that the defendant had approached him just after the fire at 132 Lamberton Street and had asked him if he would purchase the property. Furthermore, as a prelude to the proposed deal, the defendant apprised Coleman that he had burned the house at 132 Lamberton Street. Moreover, Coleman, who operated in the same circle of real estate brokers as the

defendant,[14] possessed knowledge from several sources concerning the extent of the defendant's interests in certain real estate and the magnitude of the defendant's economic woes. Also, Coleman was aware of the aborted sale of 132 Lamberton Street prior to the fire, and the defendant's willingness to burn other properties to defraud insurance companies.

In addition, the conditions under which Coleman gave his statement to the police suggest that it was given under "circumstances reasonably assuring reliability." *State* v. *Whelan,* supra, 752. Just prior to giving the statement, Coleman was asked to identify himself, and he indicated that he was giving the statement of his own free will.[15] Moreover, by allowing his conversation with the police to be recorded, he understood that the statements would in fact be relied upon, possibly in a subsequent prosecution. Further, making false statements to the police could have subjected Coleman to criminal prosecution. General Statutes §§ 53a-157 and 53a-180; *State* v. *Whelan,* supra, 754–55. On the basis of these considerations, we conclude that the trial court properly admitted Coleman's prior inconsistent statement for substantive purposes and properly

---

[14] The relevant portion of Wallace Coleman's tape-recorded statement is as follows:

"[Detective:] Um, are you familiar with a person with the name of Roger Woodson?

"[Wallace Coleman:] Yes.

"[Q.] Okay. How well do you know him?

"[A.] Just from, uh, a year maybe.

"[Q.] Okay. And how do you know him; through how?

"[A.] Just the real estate; you know, I'm a real estate broker and I buy and sell real estate.

"[Q.] Okay. And is Roger in the same—was in the same type [of] work?

"[A.] Yes (unintelligible)."

[15] The recorded statement is as follows:

"[Detective:] Do you, Wallace Coleman, give the following information to Detective Nichols of the New Haven Police Department of your own free will?

"[Wallace Coleman:] Yes."

allowed the jury to determine for itself whether to credit Coleman's trial testimony, his prior inconsistent statement, or neither.

## IV

The defendant finally claims that the trial court deviated from proper standards of judicial conduct when it rebuked and interrupted the defendant during his testimony. He argues that as a consequence of these episodes of alleged judicial misconduct, his right to a fair trial before an impartial court was violated. We disagree.

The scenario that led to the defendant's claim can be summarized as follows. During cross-examination of the defendant, it was often necessary for the trial court to direct the defendant to respond to the state's questions. On several occasions, the state asked the defendant questions to which the appropriate response was a simple "yes" or "no." The defendant continually failed to answer such questions appropriately. Consequently, the trial court was required to advise him repeatedly on such occasions that he should respond in the affirmative or negative, without explanations or embellishments. Throughout the course of the state's questioning, however, the defendant continued to answer with explanations that were not proper responses to the state's questions.

The following colloquy is representative of the episodes during which the trial court was required to admonish the defendant to answer, in a responsive manner, the questions asked:

"[Assistant State's Attorney:] So sir, your testimony then is that when Grace Hudson came to court here and testified to not only a phone conversation with you, but also a conversation that she had with you at the office where you provided that information; that was incorrect, is that it?

"[The Defendant:] Gracie Hudson—

"Q. Is that it, yes or no.

"A. I have to explain; Gracie Hudson spoke to me about the insurance.

"The Court: Sir—Mr. Woodson.

"A. She—

"The Court: Mr. Woodson! Do you hear me? Now enough of this. The question was asked—answer the question. You can't—it doesn't work like the way you want it to work. Now answer the question.

"A. Can you repeat the question please?

"[Assistant State's Attorney:] My question is this; When Grace Hudson came into court here and testified that you provided her with the information contained on that document on the phone and in person, that was incorrect? Is that your testimony?

"[Defense Counsel:] Your Honor I would ask that—

"The Court: You keep quiet until the question is asked.

"[The Defendant:] My—my—

"[Defense Counsel:] Your Honor, I would object to the question.

"The Court: What's the grounds for your objection?

"[Defense Counsel:] It's a compound question; he's asking two questions. One, he's asking the information relating to the phone and two, the information relayed in person. I would think if the State would ask his questions one question at a time I think life would be a lot much easier in this courtroom.

"The Court: The State?

"[Assistant State's Attorney:] I'm merely asking the witness whether or not he's indicating that he did not tell Grace Hudson those things and whether what she said was incorrect.

"The Court: Mr. Woodson, do you understand the question?

"[The Defendant:] I understand the question.

"The Court: All right. The question—you are to provide with an answer 'yes' or 'no.' Do you understand that?

"A. Yes.

"The Court: Answer the question.

"A. Yes I did speak to this Grace Hudson about the insurance on that property, about putting insurance on the property.

"[Assistant State's Attorney:] May that be stricken as non-responsive.

"The Court: It may be stricken, sir. The answer that you are to give calls for a 'yes' answer or a 'no' answer.

"[Assistant State's Attorney:] Sir, do you remember my question?

"[The Defendant:] Yes I do.

"Q. The question has to do with—

"[Defense Counsel:] Your Honor—I don't mean to interrupt—and I apologize to the court; maybe to make life a little bit easier; if the question could be re-asked again so that we all understand the question and—

"The Court: Counsel, there doesn't seem to be a problem because the witness indicated he does understand the question. So is this an objection?

"[Defense Counsel:] It's not an objection—just to kind of basically—

"The Court: Okay. Well you can be seated. Do you understand the question or would you like to have the attorney ask it again.

"[The Defendant:] I understand the question but it's not a question that should be answered yes or no.

"The Court: Listen; but you're not the one that's deciding how the answers are to be given here. Do you understand that?

"A. I understand that.

"The Court: Okay. Ask the question one more time; try it.

"[Assistant State's Attorney:] I'll ask two questions. Your testimony as I understand it, sir, is that as far as that exhibit is concerned which I believe is 'BBB' (sic), the insurance application, you testified twice that you did not provide Grace Hudson with the information contained on those documents either on the phone or in person, correct? Correct?

"A. Yes I provided that—yes, it has to be provided because I lived at Jones Farm Road.

"Q. Did you or did you not yourself provide the information on the application, yes or no?

"A. No, I never told Gracie to put me down on that insurance. I never told her to do that. . . .

"Q. And so your testimony then—as it was before if I understand you correctly—was that you didn't provide any of the information—not only the fact of your name being on that application, but any other information that's on there, you didn't give her any of that. Is that correct?

"A. No I didn't.

"Q. So my question then is that knowing that, your testimony is that Grace Hudson was incorrect when she testified to the fact that you provided or gave her that to put down on the policy, correct?

"A. When I—excuse me.

"Q. Correct? Yes or no?

"A. Say it again?

"Q. So that your testimony is, sir, that as far as Grace Hudson is concerned, she is incorrect when she stated that you gave her or provided her the information that is on that exhibit. That is your testimony, correct?

"A. I called her and asked for insurance, she writes it up.

"[Assistant State's Attorney:] Can that be stricken? I don't know how else to ask the question.

"The Court: Mr. Woodson, look; I don't know how many times I'm going to have to tell you. Do you understand what I'm saying to you, sir?

"A. Yes.

"The Court: Well answer the question 'yes' or 'no.' That doesn't seem to be too difficult, does it? Do you know what the question is?

"A. Yes I do know what the—

"The Court: Answer the question 'yes' or 'no.'

"[Assistant State's Attorney:] She's incorrect, is that right?

"A. Yes she is."

The defendant claims that the trial court's comments to the defendant during the course of the state's questioning amounted to a violation of his right to due pro-

cess as guaranteed by the fourteenth amendment.[16] No objection was made at trial nor did the defendant move for a mistrial. Because this issue was not properly preserved at trial, the defendant seeks relief under *State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989). Our review of the record indicates, however, that the trial court's behavior with respect to the defendant, though seemingly inelegant and misdirected at times, was not so egregious as to result in a clear violation of the defendant's constitutional rights.[17]

---

[16] The fourteenth amendment to the United States constitution provides in pertinent part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

[17] Other episodes during which the trial court was required to admonish the defendant continued throughout the state's cross-examination and include the following:

"[Assistant State's Attorney:] Did Mr. [Louis] Ranciato ever write you a check in connection with that, sir? 49 Lawrence Street?

"[The Defendant:] Allstate Insurance Company did.

"Q. Did Mr. Ranciato ever write you a check in connection with 49-51 Lawrence Street?

"A. Allstate Insurance did.

"[Defense Counsel:] Your Honor, he's answered the question.

"The Court: Wait a minute. Now look; did you hear what the question was?

"[The Defendant:] Yes.

"The Court: All right. He asked you a question; my recollection was that he asked you if Mr. Ranciato issued you a check and the answer should be yes he did or no he didn't.

"[Defense Counsel:] Your Honor, he didn't indicate [that he] issued a check.

"The Court: Sir—

"[Defense Counsel:] I apologize to the court, but the State did not say 'issue check,' he said; 'did he write you a check.' And I think there's a big difference between writing a check and issuing a check. Mr. Ranciato cleared that up when I had asked him that question. I don't mean to—

"The Court: The question can be answered yes or no, and you can go from there.

"[Assistant State's Attorney:] Do you understand the question?

"[The Defendant:] He did issue a check, yes.

\* \* \*

"Q. Okay. Did you in fact leave a message on Mr. Piasyck's answering machine—telephone answering machine that in fact you were aware that

" 'Due process requires that a criminal defendant be given a fair trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm. U.S. Const., amend. XIV; Conn. Const., art. I, § 8; *Lisenba* v. *California*, 314 U.S. 219, 62 S. Ct. 280, 86

he was talking to the police, and you in fact stated that to Mr. Piasyck?

"A. I told him that I was aware of him sabotaging Jones Farm Road telling people the septic tank was no good, don't buy the property.

"[Assistant State's Attorney:] May that be stricken as non-responsive.

"The Court: That could be stricken.

\* \* \*

"Q. Ever use the name Mugs Woodson?

"A. Mugsy is my nickname.

"Q. Have you ever—so you have used that name, is that correct?

"A. That's my nickname.

"Q. Have you used the name? Yes or no?

"[Defense Counsel:] Your Honor, he's already indicated it. I don't know how—we have to get.

"A. That's my nickname.

"The Court: Look; we have—

"A. I'm telling you that's my nickname.

"The Court: Wait a minute, Mr. Woodson. We seem to have a problem here. The question—

"A. He seems to have a problem.

"The Court: No, you listen to me for a minute now. He asked you a question; have you ever used the name Mugsy?

"A. I told him it's my nickname.

"The Court: Can't you answer the question yes or no?

"A. I said yes, that's my nickname.

"The Court: Well, answer the question yes or no because I'm getting sick and tired of these remarks from you, do you understand that? Sir? Do you understand that?

"A. Excuse me?

"The Court: Do you understand what I'm talking about?

"A. Yes I do, Your Honor.

"The Court: Well then answer the question the way you're supposed to.

"A. He asked me; I answered it.

"The Court: And you did not answer it; he asked you for either yes or no, and I'm directing you to answer the question yes or no.

"A. I never used the name, Your Honor. My nickname is Mugsy. I never used the name Mugsy, Your Honor.

"The Court: Mr. Woodson; I'm going to tell you and I'm going to tell you one more time; the question is to be answered with a 'yes you have' or 'no you haven't.' Now do you understand that?"

L. Ed. 166 [1941]; *Wojculewicz* v. *Cummings,* 145 Conn. 11, 19, 138 A.2d 512, cert. denied, 356 U.S. 969, 78 S. Ct. 1010, 2 L. Ed. 2d 1075 [1958]. In a criminal trial, the judge is more than a mere moderator of the proceedings. It is his responsibility to have the trial conducted in a manner which approaches an "atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding." *Glasser* v. *United States,* 315 U.S. 60, 82, 62 S. Ct. 457, 86 L. Ed. 680 [1942]; *Quercia* v. *United States,* 289 U.S. 466, 469, 53 S. Ct. 698, 77 L. Ed. 1321 [1933].' *State* v. *Echols,* 170 Conn. 11, 13, 364 A.2d 225 (1975)." *State* v. *Gordon,* 197 Conn. 413, 424D–25, 504 A.2d 1020 (1985); see also *State* v. *Fernandez,* 198 Conn. 1, 10–11, 501 A.2d 1195 (1985). However, " ' "when it clearly appears to the judge that for one reason or another the case is not being presented intelligibly to the jury, the judge is not required to remain silent. . . ." ' " *State* v. *Fernandez,* supra, 11, quoting *People* v. *Yut Wai Tom,* 53 N.Y.2d 44, 56, 422 N.E.2d 566, 439 N.Y.S.2d 896 (1981).

The task of determining whether judicial misconduct prejudices the defendant is especially difficult because "[the court is] not given the benefit of witnessing the juxtaposition of personalities which may help prevent reading too much into the cold black and white of a printed record." (Internal quotation marks omitted.) *State* v. *Fernandez,* supra, 13; *United States* v. *Grunberger,* 431 F.2d 1062, 1067 (2d Cir. 1970). The risk of constitutional judicial misconduct is greatest in cases where the trial court has interceded in the merits of the trial. See *State* v. *Fernandez,* supra, 14–17 (impugning credibility of defense's only witness violated right to fair trial); but see *State* v. *Tatum,* 219 Conn. 721, 739–42, 595 A.2d 322 (1991) (questioning of witnesses did not serve to endorse state's view of case).

In the present case, however, the trial court neither sought to supplement the state's cross-examination of

the defendant or restrict his testimony unduly. Nor did the trial court comment on the significance of the evidence presented. The court merely sought clarification of the defendant's answers for the jury when the defendant appeared to be obstinately unresponsive to the state's questioning. The trial court generally admonished and rebuked the defendant only when he consistently refused to answer the questions as they were asked, rather than as he insisted on answering them. The trial court's conduct did not reflect upon the merits of the defendant's case or undercut it in any manner but was instead an attempt, albeit sometimes brusque, to ensure the orderly progress of the trial. The defendant was not clearly deprived of his right to a fair trial by the court's actions and, under the third prong of *Golding*, his claim must fail.

The judgment is affirmed.

In this opinion the other justices concurred.